IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# FILED

ROBERT LARK,                                        :        CIVIL ACTION
    Petitioner,              JUL - 3 2007

                           :        (DEATH PENALTY
   v.              MICHAEL E. KUNZ, Clerk        HABEAS CORPUS)
              By_____Dep. Clerk

                           :
JEFFREY BEARD, ET AL.,                              :        NO. 01-1252
    Respondents              :

## MEMORANDUM

**Padova, J.**                                                      July 3, 2007

## I.    INTRODUCTION

      Robert Lark was convicted of first degree murder, possession of an instrument of crime,

terroristic threats, and kidnaping in the Court of Common Pleas of Philadelphia County on June 28,

1985, and was subsequently sentenced to death.  The convictions resulted from Lark's killing of Tae

Bong Cho, and his kidnaping and restraint of Cho's two young children and their mother.  He

appealed, and the Supreme Court affirmed his convictions and sentences on May 20, 1988.[1]  See

Commonwealth v. Lark, 543 A.2d 491 (Pa. 1988).[2]  Following extensive state collateral proceedings

---

    [1]In addition to the death sentence, Lark also received concurrent terms of 2 and ½ years to 5 years imprisonment for possession of an instrument of crime, and consecutive sentences of 3 and ½ years to 7 years imprisonment for terroristic threats, and 10 to 20 years imprisonment for kidnaping.

    [2]The evidence supporting Lark's convictions, as set forth by the Pennsylvania Supreme Court, was:

> The three separate criminal incidents for which appellant was tried all
> shared a common denominator, the robbery of Mr. Tae Bong Cho of
> over $4,000.00 cash near his home in North Philadelphia on
> December 28, 1978.  The robbery was accomplished by appellant
> placing a gun (which resembled a .45 caliber pistol but turned out to

detailed below, Lark filed the instant petition for writ of habeas corpus, pursuant to 28 U.S.C. §

2244, on March 16, 2001, alleging an Eighth Amendment ineffective assistance of counsel claim in

connection with both the guilt and penalty phases of his trial, as well as a Fourteenth Amendment

Equal Protection claim.  For the following reasons, we find that the use of peremptory challenges

by the prosecution violated Lark's constitutionally protected right to equal protection of the laws.

Accordingly, we conditionally grant the writ.[3]

---

be a replica pellet gun) against the head of Mr. Cho's baby son and demanding his money.  After taking the money, a check and other items, appellant fled in a red Cadillac.

Responding to a police radio broadcast, appellant was apprehended in a red Cadillac within minutes of this robbery in the possession of $4,255.00 in currency, a "BB repeater pistol," a change purse with the names of Mr. Cho and Sue Cho, and other items. Appellant was taken to the Northwest Detectives police station where he encountered Mr. Cho, in the process of rendering a police report, who immediately identified appellant as the man who took his money.  Appellant was then charged with the robbery of Tae Bong Cho.

On February 22, 1979, Tae Bong Cho was assassinated while working behind the counter of his take-out food store at 3706 North Broad Street in North Philadelphia by one shot to his head at close range.  The assassin wore a ski mask or stocking over his head, but several of the witnesses present in the store described his height, weight and clothing, and stated that he had placed a gun in the back waistband of his pants as he exited the store. Mr. Cho was scheduled to appear the next day, February 23, 1979, as the principal witness for the Commonwealth at appellant's preliminary hearing on the robbery charges.

Commonwealth v. Lark, 543 A.2d at 493.

[3]Given our resolution of Lark's Equal Protection claim, we need not reach his ineffective assistance of counsel claim in connection with the guilt phase of his trial.  We note that the Commonwealth has conceded ineffectiveness of counsel in the penalty phase of Lark's trial.  (See Resp.'s Pre-trial Mem. at 2.)

## II.    PROCEDURAL BACKGROUND

In November 1994, some six years after his direct appeals ended, Petitioner unsuccessfully sought a stay of execution from the Honorable John J. Poserina, Jr., of the Court of Common Pleas for Philadelphia County, see Commonwealth v. Lark, Jan. Term 1980, Nos. 2012-2022 (Ct. C.P. Phila. Nov. 7, 1994) (unpublished order denying stay of execution), whose decision he appealed to the Pennsylvania Supreme Court.  Commonwealth v. Lark, Capital Appeal No. 77 (Pa.).  He then filed a pro se Motion for a Stay of Execution in the United States District Court for the Eastern District of Pennsylvania on or about November 8, 1994. Lark v. Lehman, No. Civ. A. 94-6762 (E.D. Pa.).  On November 10, 1994, a stay of execution was issued to permit Lark to file a state post-conviction petition.  The Pennsylvania Supreme Court also issued a stay to permit the filing of a state post-conviction petition.  See Commonwealth v. Lark, Capital Appeal No. 77 (Pa. Nov. 10, 1994) (unpublished order).

Lark had filed a pro se petition in the Philadelphia Court of Common Pleas pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9541 et seq., on November 4, 1994.  Pro se Motion for Post-Conviction Collateral Relief, Commonwealth v. Lark, Jan. Term 1980, Nos. 2012-2022 (Ct. C.P. Phila. Nov. 4, 1994).  On February 8, 1995, he filed an amended motion for post-conviction relief pursuant to the PCRA through pro bono counsel Thomas C. Zielinski ("First PCRA Petition").    Amended Motion for Post-Conviction Collateral Relief, Commonwealth v. Lark, Jan. Term 1980, Nos. 2012-2022 (Ct. C.P. Phila. Feb. 8, 1995).  The First PCRA Petition raised twenty-five claims of trial court error and ineffective assistance of counsel. Id.  Judge Poserina ordered that Lark produce affidavits of his proposed witnesses.  (03/08/95 N.T. at 8-9.)  The Commonwealth moved to dismiss the petition, and on August 2, 1995, after argument

on the motion to dismiss, Judge Poserina dismissed the First PCRA Petition without an evidentiary hearing. Commonwealth v. Lark, Jan. Term 1980, Nos. 2012–2022 (Ct. C.P. Phila. Aug. 2, 1995) (unpublished order). On September 12, 1995, the dismissal order was amended by a written Order and Opinion denying post-conviction relief. Commonwealth v. Lark, Jan. Term 1980, Nos. 2012-2022, slip op. (Ct. C.P. Phila. Sept. 12, 1995). Petitioner appealed to the Pennsylvania Supreme Court.

In early April 1997, while the appeal was pending, the Philadelphia County District Attorney's Office released a tape of former prosecutor Jack McMahon (the "McMahon Tape"), in which McMahon gave instructions to his prosecutorial colleagues on methods of jury selection. The instructions advocated the exclusion of veniremen on the basis of race and gender. On July 1, 1997, Lark applied to the Supreme Court for a remand of his First PCRA Petition to permit review of post-conviction relief claims arising out of the issues raised by the McMahon Tape. The Supreme Court affirmed the denial of post-conviction relief on July 23, 1997, Commonwealth v. Lark, 698 A.2d 43 (Pa. 1997), and denied Lark's application for remand on July 30, 1997, Commonwealth v. Lark, Capital Appeal No. 124 (Pa. July 30, 1997) (unpublished order).

Petitioner thereafter filed a second motion for post-conviction relief with the Court of Common Pleas ("Second PCRA Petition"). In this pleading, Lark set forth several claims based upon newly discovered factual predicates, including a claim of discriminatory jury selection based in part on the McMahon Tape. Motion for Post-Conviction Collateral Relief, Commonwealth v. Lark, Jan. Term 1980, Nos. 2012-2022 (Ct. C.P. Phila. Aug. 29, 1997). Lark amended his Second PCRA Petition on January 9, 1998, providing additional detail and argument in support of his claim of discriminatory jury selection. Amended Motion for Post-Conviction Collateral Relief,

Commonwealth v. Lark, Jan. Term 1980, Nos. 2012-2022 (Ct. C.P. Phila. Jan. 9, 1998).  On June

9, 1998, Judge Poserina denied the Petition without an evidentiary hearing.  (N.T. 06/09/98, 13.)

Petitioner appealed to the Pennsylvania Supreme Court, which affirmed the denial of post-conviction

relief on different grounds on February 23, 2000.  Commonwealth v. Lark, 746 A.2d 585 (Pa. 2000).

　　　　During the pendency of the appeal of the denial of his Second PCRA Petition, Lark filed

another habeas petition in this court.  Lark v. Horn, No. Civ. A. 98-3708 (E.D. Pa.).  Lark admitted

that his petition contained some unexhausted claims – those claims that were the subject of his

Second PCRA Petition.  Lark was concerned that the statute of limitations established by the

Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2241(d), would run on his

exhausted claims before he had exhausted his state post-conviction remedies with respect to his

remaining claims.  The court dismissed the Petition without prejudice, ordering that any re-filed

petition would relate back to the date of the initial filing.  Lark v. Horn, No. Civ. A. 98-3708 (E.D.

Pa. Oct. 15, 1998) (unpublished order).  After the Pennsylvania Supreme Court denied Lark's appeal

from the denial of his Second PCRA Petition, Lark timely filed the instant Petition in this Court, in

which he raises fifteen claims for relief from his state convictions and sentences.

## III.   THE COURT'S MAY 23, 2006 ORDER

　　　　By order of May 23, 2006, we granted in part and denied in part Lark's request for an

evidentiary hearing. Claim I of Lark's Petition alleges that the trial prosecutor committed a violation

of the Equal Protection Clause when he used peremptory strikes on African American veniremen in

Lark's trial, and that the Philadelphia District Attorney's Office engaged in a policy of discriminatory

jury selection.  See Batson v. Kentucky, 476 U.S. 79 (1986); Swain v. Alabama, 380 U.S. 202

(1965).  Lark's trial counsel, Peter Rogers, raised the issue of the Commonwealth's improper

peremptory strikes during the voir dire and sought to preserve a record of the racial composition of the jury.[4] The issue was not raised on direct appeal, but was raised while the denial of Lark's first PCRA petition was on appeal. It was at that point in time that the existence of the McMahon Tape became public. Lark never received an evidentiary hearing on this claim in state court. In the Order of May 23, 2006, we determined that the claim was not procedurally defaulted because the state relied on an inadequate state procedural ground for its decision to deny review.[5] We also noted that the McMahon Tape, as well as a statistical study attempting to correlate the McMahon Tape's jury selection techniques with the actual results obtained in Philadelphia County criminal jury selection proceedings, were not available when Lark filed his first PCRA.

We ordered an evidentiary hearing, finding that Lark had pled a prima facie case of

---

[4]We found in our May 23 Order that the trial judge refused to preserve a record of the jury strikes because there was "no way to determine a person's race or color." Notes of Testimony at 178, Commonwealth v. Lark, Jan. Term 1980, No. 2012-2022 (Ct. C.P. Phila. June 7, 1985). Rogers then asked to preserve the names from the panel examined the prior day in order to later investigate and determine the veniremen's races and genders. The trial judge was unresponsive to this request. (Id. at 179-81.)

[5]Lark sought an evidentiary hearing on Claims I, II, and III of his Petition. Claim I is the Batson/Swain claim, for which we granted a plenary hearing. Claim II alleges ineffective assistance of counsel in the guilt phase of the trial. We granted an evidentiary hearing on this claim to elicit trial counsel's testimony with respect to the following aspects of Lark's claim: (1) trial counsel improperly handled the suggestion of a polygraph test during Benjamin Smith's testimony; (2) he introduced incriminating out-of-court statements made by Roosevelt Purvis, Charlene Wiggins, Carolyn Purvis, and Muriel Jackson; (3) he requested that Michael Johnson's memory be refreshed by reading his prior inconsistent statement in the presence of the jury, agreed to its admission as substantive evidence, and failed to redact hearsay within the statement; (4) he failed to investigate to uncover helpful impeachment evidence showing that Lark was in North Carolina in August 1979 (the time period during which he was alleged to have told people in Philadelphia that he committed the murder); and (5) he failed to object to the preclusion of a verdict on second degree murder, a lesser degree of homicide. Claim III alleges ineffective assistance in the penalty phase. We granted an evidentiary hearing on Claim III in its entirety. Following our Order, the Commonwealth conceded Lark's claim of ineffective assistance in the penalty phase of his trial. (See Resp.'s Pre-trial Mem. at 2.)

discrimination.  See Batson, 476 U.S. at 96 (setting out a three-step process for establishing an Equal

Protection violation in jury selection, the first step of which is the determination of a prima facie case

of purposeful discrimination based solely upon the prosecution's use of peremptory strikes to remove

minority members of the jury venire).  Lark is African-American.  He alleged that at least ten and

perhaps as many as twelve of the fifteen veniremen peremptorily struck by the Commonwealth were

African-American, that their answers to voir dire questions did not reveal any race-neutral reason

for the strikes, and that Mr. Carpenter, the trial prosecutor, tacitly admitted that he was excluding

African Americans from the jury when he responded to Attorney Rogers' objection by stating "how

awful."  See Holloway v. Horn, 355 F.3d 707, 722 (3d Cir. 2004) (identifying a pattern of strikes

against racial group members and questions and statements during the voir dire as relevant factors

in determining whether a prima facie showing of discrimination has been made).  Based on the

evidentiary hearing conducted November 8 and 9, 2006, we make the following findings of fact with

regard to step two of the Batson inquiry.

## IV.   FINDINGS OF FACT

1.   Lark was represented at trial by Peter Rogers, now a Judge of the Philadelphia Court of

Common Pleas.

2.   The Commonwealth was represented by former Philadelphia Assistant District Attorney John

Carpenter.

3.   At the time of Lark's trial in 1985, Carpenter had ten-years experience as a prosecutor.  (N.T.

11/8/06 at 42-43.)

4.   Carpenter received no formal training from the DA's Office on jury selection.  (Id. at 44.)

5.   The Philadelphia DA's Office provided no formal instruction about how to pick juries when

Carpenter joined the Office, and had no formal rules about how to make peremptory juror strikes. (Id. at 44.)

6.      At the time of Lark's trial, prosecutors had complete discretion in how they made peremptory strikes. (Id. at 45.)

7.      Carpenter gained jury selection experience by actually picking juries during his employment with the DA's Office. He did not believe that picking juries was a science, but rather relied on his past experiences. He did not automatically accept or reject veniremen. (Id. at 45.) He could not state any specific criteria he used in making peremptory jury strikes, other than his own past experiences. (Id. at 46.)

8.      During his career, Carpenter tried over one thousand jury trials. (Id. at 49.)

9.      Carpenter knew Jack McMahon. (Id. at 46.) McMahon was never his supervisor or senior in the DA's Office and he never gave Carpenter instructions on how to pick a jury. (Id. at 47.) Carpenter never took direction from Mr. McMahon on how to pick a jury. (Id.)

10.     Although familiar with the existence of the McMahon Tape, Carpenter was not familiar with its contents. (Id. at 47.)

11.     Lark's jury selection occurred prior to the creation of the McMahon Tape.

12.     McMahon advocated using race, gender, occupation, and neighborhood to pick juries in capital cases in Philadelphia County. He taught that a DA's goal was to pick a jury that was conviction prone, possessed respect for law and authority, was predisposed to accept the prosecution's case at face value, and was more likely to convict. (McMahon Tape Tr. at 46-51.)

13.     He also instructed on how to avoid jurors that did not fit those goals. He advised that the best persons to pick as jurors were stable, conservative, middle-class, well dressed people, from good

neighborhoods, but who were not particularly bright and not inclined to critically analyze. (Id. at 20.) He stressed that a jury should be made up of persons of comparable intellectual ability, so that no one juror dominated the deliberations. (Id. at 58.)

14.     Given the holding of Batson, McMahon advised against routinely striking all African-American veniremen.  (Id. at 56.)  His goal was a jury with sufficient African-American representation so as to avoid racial questions.  His "ideal jury," he stated, would be 8 whites and 4 blacks. (Id. at 59.) He suggested using other factors, such as low income neighborhoods, age and education to distinguish between "good" and "bad" African-American veniremen.  He advocated picking "older Blacks" (id. at 55), with the worst African-American jurors being young men and women and any who were well educated. (Id. at 55-57.) He also avoided African-American women because of an alleged maternal instinct toward young African-American male defendants. (Id. at 56.) He perceived older African-American men as being from "a different era" with respect for the law. (Id.) He also avoided seating doctors, lawyers, law students, social workers and teachers. (Id. at 63.)

15.     Carpenter remembered the Lark trial well because it was the only case where he obtained a death sentence. (Id. at 50.) He also recalled that he had a tense relationship with defense counsel Rogers. (Id. at 51.)

16.     In preparation for his testimony at the evidentiary hearing, Carpenter reviewed the transcript of the state court voir dire. (Id. at 51.) He testified that he did not "specifically recall much if anything about it.  And particularly individual jurors, I – when I read what this person has said – said and I read the corrections, I don't bring up an image of that person and have a specific – as they would say, a specific recollection of that individual." (Id. at 51.)

17.     Carpenter placed handwritten notations on the venire list during the jury selection and was

shown those notes to refresh his recollection. (<u>Id.</u> at 52-53.)

18.    He used symbols as a short hand method to record his impressions of certain aspects of each venireman, indicating, for example, whether the venireman had a hardship, or had sympathy toward a defendant. (Ex. C-1.) His symbols changed from Day One of the voir dire to Day Two of the voir dire. On Day One, he used letter symbols, such as "A," "D," "H," and "J," as well as word notations. On Day Two, he used numbers, corresponding to a key that he placed on the bottom of the page. (N.T. 11/8/06 at 53.) Carpenter identified the symbol "D" as indicating a possible bias in favor of the defendant. (<u>Id.</u>) He identified the symbol "H" as indicating a juror hardship. (<u>Id.</u>) Although he could not recall what the symbol "A" indicated on the Day One venire list, he denied he used the symbol to denote that a venireman was African-American. (<u>Id.</u> at 53-54.) The key used on Day Two does not include any method of noting a venireman's race. (Ex. C-1.)

19.    Carpenter was not systematic in his note-taking. (N.T. 11/8/06 at 55.)

20.    At the time of Lark's jury selection, which occurred one-year prior to the Supreme Court's decision in <u>Batson</u>, but after its decision in <u>Swain</u>, Carpenter was not sure if it was permissible to strike jurors on the basis of their race. He was aware of the rule of <u>Swain</u> condemning the systematic exclusion of racial groups from jury venires. (<u>Id.</u> at 65.) He was also familiar with state court precedents. Carpenter testified that, at the time of Lark's jury selection, it was routine for defense attorneys to raise objections to prosecutorial peremptory strikes of minority veniremen based on race. (<u>Id.</u> at 66.)

21.    Carpenter testified that he had no current recollection of the Lark jury selection. He was subsequently presented with a transcript of the voir dire in an attempt to refresh his recollection. He had no independent or refreshed recollection of the voir dire.

22.     The first venireman he peremptorily struck was Shirley Sampson, an African-American female. Carpenter had no independent recollection of why he struck Sampson. (Id. at 66.) After reading the transcript, Carpenter had no refreshed recollection of why he struck Sampson. (Id. at 67.)

23.     Following an objection that was initially sustained, the Court permitted Carpenter to state, based on his review of the transcript, whether he could determine why he would have struck Sampson. (Id. at 67-71.)[6] He responded that he could not state why he exercised a peremptory strike on Sampson or perhaps any juror, but he denied striking any juror because of his or her race. He testified that using race as a factor in jury selection was legally and morally abhorrent to him. (Id. at 71.)

24.     According to Carpenter, his practice was to consider certain criteria in exercising peremptory challenges. The neighborhood where the potential juror lived was significant to his decision to exercise a peremptory strike because he did not want jurors who lived near the defendant or to where the incident occurred. (Id. at 73-74.) He took into account employment status because persons with a job have roots in the community. (Id. at 82.) He considered a potential juror's age because older jurors are wiser and more responsible. (Id. at 94.) If a potential juror had relatives that were police

_____

[6]The Commonwealth asked Carpenter, "After reviewing the record and under the circumstances of this case, can you tell us why you would have struck Ms. Sampson?" (Id. at 67.) Lark objected on the basis that the evidence was irrelevant under Batson because it constituted a general denial of racial bias. (Id.) See Johnson v. Love, 40 F.3d 658, 668 (3d Cir. 1994) (holding that a general denial of discrimination is not enough to satisfy the Commonwealth's burden at step two). The Court sustained the objection to the question, as asked, ruling that the witness, who had previously testified to having no recollection as to why he struck Sampson, could not express reasons that did not exist in the record. (Id. at 68.) After further argument, the Court allowed Carpenter to testify whether, after reviewing the record, he could identify factors with regard to each venireman that, as a prosecutor, he typically would have taken into account in exercising a peremptory strike. (Id. at 69.)

-11-

officers, he considered that a positive factor. (Id. at 95.) He also considered home ownership to be a positive factor because it showed a stake in the community. (N.T. 11/9/06, 10.) He considered certain vocations to be significant and did not want teachers and social workers as jurors. (Id.) Other factors he considered were hardship, prior jury experience, whether the juror was a victim of crime or a witness or defendant in a criminal case, whether the juror knew any potential witness in the trial, and whether the juror had any feelings about the death penalty. (Id. at 48.)

25.     Carpenter used a peremptory strike to keep Alwina Green, an African-American female, off of Lark's jury. At the time he exercised that strike, four jurors had been seated including at least one African-American female. (N.T. 11/8/06 at 75.) Carpenter had no independent recollection of why he struck Green and no recalled recollection after reviewing the voir dire transcript. (Id. at 76-77.) He testified, after reviewing the voir dire transcript, that Green seemed to have been a perfectly acceptable juror. (Id. at 77.) From his review of the transcript, Carpenter stated that he may have used his peremptory strike because Green was the mother of two teen-aged children and was attending night school. He perceived that these factors may have indicated to him at the time that jury service would be too heavy a burden on her. (Id. at 80.)

26.     On cross-examination, Carpenter conceded that Green did not live in a neighborhood related to the defendant, the victim, or the incident, and that she had a stable job, a stable home life, and owned her own home. (N.T. 11/9/06 at 25-26.) He also conceded that Green stated during voir dire that her night classes would not have interfered with jury service and that she worked full time during the day, for which jury service would merely have been a substitute. (Id. at 27.)

27.     The next venireman struck by the Commonwealth was Deborah Cooper, an African-American female. Carpenter had no independent recollection of why he struck Cooper and no

recalled recollection after reviewing the voir dire transcript. (N.T. 11/8/06 at 81.) From his review of the transcript, Carpenter suggested that he may have used his peremptory strike because both Lark and his attorney were young, attractive men and Cooper was a twenty year old woman. (Id. at 82.) Cooper was also unemployed. (N.T. 11/9/06 at 29.)

28.     The next venireman struck by the Commonwealth was Willie Geter, an African-American female. Carpenter had no independent recollection of why he struck Geter and no recalled recollection after reviewing the voir dire transcript. (N.T. 11/8/06 at 83.) Carpenter did not ask Geter any questions during voir dire. From his review of the transcript, Carpenter stated he may have used his peremptory strike because Geter lived in the neighborhood where the incident occurred. (Id.)

29.     Timothy Landis, a Caucasian male, was the next venireman struck by the Commonwealth. Carpenter had no independent recollection of why he struck Landis and no recalled recollection after reviewing the voir dire transcript. (Id. at 84.) From his review of the transcript, Carpenter suggested that he may have used his peremptory strike because Attorney Rogers seemed to have developed a rapport with Landis during Rogers' voir dire questioning. (Id. at 84-85.) Also, Landis was a pre-med student at Penn with an interest in psychology, but Carpenter stated that this fact was less important than the rapport he perceived to have developed between Landis and Rogers. (Id. at 86-87.)

30.     Florence Williams, an African-American female, was the next venireman struck by the Commonwealth. Carpenter had no independent recollection of why he struck Williams and no recalled recollection after reviewing the voir dire transcript. (Id. at 88.) From his review of the transcript, Carpenter could identify no factors present with regard to Williams that he typically would

-13-

have taken into account in exercising a peremptory strike.  (Id. at 88.)

31.    The next venireman struck by the Commonwealth was Winnie Traynam, an African-American female.  Carpenter had no independent recollection of why he struck Traynam and no recalled recollection after reviewing the voir dire transcript.  (Id. at 89.)  From his review of the transcript, Carpenter identified the following factors with regard to Traynam, which he stated he typically would have taken into account in exercising a peremptory strike:  she was from roughly the same neighborhood where the incident occurred, and that she had two bachelor sons living at home who were approximately the same age as Lark.  (Id. at 90.)  On cross-examination, Carpenter conceded that Traynam's two sons had to have been far older than Lark, given references in the voir dire that Traynam was elderly at the time of Lark's trial.  (N.T. 11/9/06 at 44.)

32.    Following the voir dire of Traynam, Larks's trial recessed for the day.  Jury selection continued the following day with a new panel of venireman.  (N.T. 11/8/06 at 92.)

33.    William Wilson, an African-American male, was the next venireman struck by the Commonwealth.  Carpenter was not asked if he had an independent or refreshed recollection regarding Wilson. From his review of the transcript, Carpenter suggested that he may have used his peremptory strike because Wilson was "a charming rouge" with a history of alcoholism and trouble with the police.  Wilson also referred to Lark as a "young boy."  Carpenter stated that Wilson would have been someone "not from the mainstream of Philadelphia."  (Id. at 93.)

34.    Lisa Patton, an African-American female, was the next venireman struck by the Commonwealth. Carpenter had no independent recollection of why he struck Patton and no recalled recollection after reviewing the voir dire transcript.  (Id. at 93.)  Carpenter suggested that he would have considered that Patton was from the general neighborhood where the murder took place, a

-14-

young woman and a student. Carpenter also stated that he preferred more mature jurors. (Id. at 94.)

35.      The next venireman struck by the Commonwealth was Edison Cisco, an African-American male. Carpenter had no independent recollection of why he struck Cisco and no recalled recollection after reviewing the voir dire transcript. (Id. at 96.) Carpenter could identify no specific factor present with regard to Cisco that he typically would have taken into account in exercising a peremptory strike. (Id. at 97.)

36.      Sandra Williams, an African-American female, was the next venireman struck by the Commonwealth. Carpenter had no independent recollection of why he struck Williams and no recalled recollection after reviewing the voir dire transcript. (Id. at 98.) Carpenter noted that Williams lived in the area where the murder took place. (Id.)

37.      Helen Lewis, an African-American female, was the next venireman struck by the Commonwealth. Carpenter had no independent recollection of why he struck Lewis and no recalled recollection after reviewing the voir dire transcript. (Id. at 100.) Carpenter noted the following factors in the transcript of Lewis' voir dire that he would have taken into account:  she had a daughter that was robbed at gunpoint – a positive factor for Carpenter – but she seemed overly concerned about being fair; she also had a son who was arrested for a crime. (Id. at 100.)

38.      The next venireman struck by the Commonwealth was Edith Jefferson, an African-American female. Carpenter had no independent recollection of why he struck Jefferson and no recalled recollection after reviewing the voir dire transcript. (Id. at 101.) Jefferson had children the approximate age of Lark. (Id. at 102.) Carpenter also speculated that he may have grown more choosey in his selections at that point in the voir dire process because numerous jurors had been seated and he had many peremptory strikes remaining. (Id. at 102.)

39.     Charles Rabb, a Caucasian male, was the next venireman struck by the Commonwealth. Carpenter had no independent recollection of why he struck Rabb, but believed he had a refreshed recollection. (Id. at 103.) He stated that, after reading the voir dire transcript, he remembered that Rabb had approached Attorney Rogers outside the courtroom because he knew him from his neighborhood. (Id.)

40.     The last venireman struck by the Commonwealth was Rosa Erbe, an African-American female.  Carpenter had no independent recollection of why he struck Erbe and no recalled recollection after reviewing the voir dire transcript. (Id. at 104.) From his review of the transcript, Carpenter suggested that he may have used his peremptory strike because Erbe had two sons who had been arrested. (Id. at 105.)

41.     Following the Commonwealth's peremptory strike of venireman Florence Williams, Attorney Rogers raised an objection, and sought to preserve a record, regarding the Commonwealth's pattern of using peremptory strikes to remove African-American veniremen from the jury.  Notes of Testimony at 176-77, Commonwealth v. Lark, Jan. Term 1980, No. 2012-2022 (Ct. C.P. Phila. June 7, 1985.  Rogers stated to the trial judge, "as of this afternoon, your Honor, he is striking all blacks." Carpenter responded, "Oh, how awful." Id. at 177.

42.     Carpenter testified that he remembered exactly what he meant when he said "Oh, how awful."  He was being sarcastic, because he recognized Rogers' objection as an attempt to raise a racial issue.  When he made the statement, nine jurors had been seated of whom three were African-American. (N.T. 11/8/06 at 106.)  Carpenter was irritated with what he saw to be a ploy to put a racial issue into the case.  He testified that he used sarcasm, which he conceded was not his most attractive quality, at other points in the trial when he became frustrated with Rogers' trial tactics.

-16-

(Id. at 107-108.)

43.    On cross-examination, Carpenter agreed that a racially diverse jury was desirable. (N.T.11/9/06 at 6.) He did not want an all white jury so as to avoid any resemblance to the all white juries in the South before the Civil Rights Era. He also felt it was impossible to empanel an all white jury given the demographics in Philadelphia. (Id.) He also did not want a jury with a sole African-American member because that person might feel a need "to uphold the whole race if there was a black defendant." (Id.) Carpenter denied that it would have been tactically disadvantageous to have had an all black jury. (Id. at 7.) He also denied that he "strove" for racial diversity, stating that racial diversity would have been "nice," because a diverse jury is representative of the community. (Id. at 8.) He denied seeking a particular racial mix that he believed would have been the most tactically advantageous for the Commonwealth. (Id. at 8.)

44.    Juror #3 was Filomenia Caione, a Caucasian female. During voir dire she indicated that she was an unmarried student at Villanova University, living at home with her parents, and working at a department store. (Id. at 32.) Carpenter conceded on cross-examination that Attorney Rogers examined Caione and developed a "rapport" with her. (Id. at 33.) However, Carpenter testified that she possessed the following factors that he might have considered in his decision to put her on the jury: she was employed, and attended a Catholic university, demonstrating to him that she would be able to follow instructions and had a conscience. (Id.) Also, although she was young, she had lived abroad for three years. (Id. at 35.)

45.    Juror # 9 was Joseph Merrill, a twenty-two year old Caucasian male. (Id. at 37.) Juror #2 was Robert Arentzen, a twenty-three year old Caucasian male. (Id. at 38.) When asked to explain the difference between Merrill and Arentzen, whom he accepted as jurors despite their youth, and

Lisa Patton and Deborah Cooper, whom he struck, Carpenter stated, referring to Merrill, "he's a man for one thing." (Id. at 37.)   He added that, while he considered age to be important, he did not consider it to be determinative.  (Id. at 37.)   The voir dire record also revealed that Merrill was married, employed, Catholic school educated, and his father-in-law was a police officer, all factors Carpenter liked in a juror. (Id. at 50-51.)  However, Arentzen was unmarried and living at home with his parents. (Id. at 38.)

46.    Juror #10 was Margaret Petruzelli, a Caucasian female who stated in voir dire that she had a son aged thirty. (Id. at 46.)  She was not struck by Carpenter even though she had a son who was near to the defendant in age.

47.    The jury ultimately seated to decide Lark's case contained four African-Americans members. Carpenter used fifteen peremptory strikes.  He struck 71% (12 of 17) of the available African-American venire members.   He struck only 17% (3 of 18) of the non-African-American veniremen. (Stipulation #1.)

48.    Carpenter did not exercise all of the peremptory strikes allotted to the prosecution in Lark's jury selection.  (N.T. 11/8/06 at 73.)

49.    Carpenter had no actual recollection, either independent or refreshed, of the reasons for any of his peremptory strikes, with the sole exception of the reason for which he struck Charles Rabb.

50.    Carpenter was unable to offer any race-neutral justification for his peremptory strikes of Shirley Sampson, Florence Williams and Edison Cisco.

51.    Carpenter's attempts to state race-neutral justifications for his peremptory strikes of all the other veniremen, based on factors he ordinarily took into account in making jury selection decisions, is circumstantial evidence of the reasons why he might have exercised those peremptories during

-18-

Lark's voir dire.

## V.    DISCUSSION

In Batson, the Supreme Court reiterated the well-settled principle that the Equal Protection Clause prohibits discrimination on account of race in selection of both the venire and the petit jury. Batson, 476 U.S. at 88. "This principle, which dates back at least as far as Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879), recognizes that racial discrimination in the selection of jurors harms 'not only the accused whose life or liberty they are summoned to try,' but also harms the potential juror, whose race 'is unrelated to his fitness as a juror.'" Riley v. Taylor, 277 F.3d 261, 275 (3d Cir. 2001) (en banc) (quoting Batson, 476 U.S. at 87).   In Batson, the Court stated that "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." Id.

In Batson, the Court reexamined the evidentiary burden its prior opinion in Swain had placed on a criminal defendant who alleged that the State improperly used its peremptory challenges to exclude jurors based on race.   Under Swain, a defendant could satisfy a prima facie case of purposeful discrimination by showing that a prosecutor, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries." 380 U.S. at 223.   Swain, thus, "tried to relate peremptory challenge [claims] to equal protection [claims] by presuming the legitimacy of prosecutors' strikes except in the face of a longstanding

-19-

pattern of discrimination." Miller-El v. Dretke, 545 U.S. 231, 238-39 (2005) ("Miller-El II").[7]

Noting that many lower courts had interpreted Swain to hold "that proof of repeated striking of blacks over a number of cases was necessary to establish a violation of the Equal Protection Clause," Batson, 476 U.S. at 92, a demand that created a "crippling burden of proof" that "turned out to be difficult to the point of unworkable," Miller-El II, 125 S.Ct. at 2324, the Court in Batson recognized that this standard had resulted in "prosecutors' peremptory challenges [becoming] largely immune from constitutional scrutiny." Batson at 92-93 (footnote omitted). Accordingly, in Batson, the Court held that a defendant could make out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" about a prosecutor's conduct during the defendant's own trial. Miller-El II at 2324.[8]

_____

[7]In Miller-El v. v. Cockrell, 537 U.S. 322 (2003) ("Miller-El I"), the Supreme Court held that reasonable jurists could have debated whether the prosecution's use of peremptory strikes against African-American prospective jurors was a result of purposeful discrimination, and thus that Miller-El was entitled to a certificate of appealability. Accordingly, it remanded the matter for further proceedings. Miller-El II was a second appeal raising the substantive issues addressed after remand.

[8]Miller-El II also recognized that the evidentiary burdens of Swain remain viable as an alternative method of proving purposeful discrimination.
> Although the move from Swain to Batson left a defendant free to
> challenge the prosecution without having to cast Swain's wide net,
> the net was not entirely consigned to history, for Batson's
> individualized focus came with a weakness of its own owing to its
> very emphasis on the particular reasons a prosecutor might give. If
> any facially neutral reason sufficed to answer a Batson challenge, then
> Batson would not amount to much more than Swain. Some stated
> reasons are false, and although some false reasons are shown up
> within the four corners of a given case, sometimes a court may not be
> sure unless it looks *beyond the case at hand*. Hence Batson's
> explanation that a defendant may rely on "all relevant circumstances"
> to raise an inference of purposeful discrimination.

Miller-El II at 2325 (emphasis added).

-20-

Under Batson, courts apply a three-step burden shifting analysis.[9] At step one, "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." Id. at 96.[10]  Once the defendant makes a prima facie showing of racial discrimination, step two requires the state to articulate a race-neutral explanation for its use of peremptory challenges.  If it can do so, at step three the trial court must determine whether the defendant has established purposeful discrimination.  See id. at 96-98; Riley, 277 F.3d at 275; Simmons v. Beyer, 44 F.3d 1160, 1167 (3d Cir. 1995).  "The ultimate burden of persuasion regarding racial motivation rests with, and does not shift from, the defendant."  Riley at 275 (citing Purkett v. Elem, 514 U.S. 765, 768 (1995)).

A.    Step Two of the Batson Analysis

In our May 23, 2006 Order, we determined that Lark established a prima facie case of racial discrimination.  The facts as we have found them lead to the inexorable conclusion that the Commonwealth has failed to meet its burden at step two of the Batson analysis.  At step two, the

_____

[9]The Commonwealth asserts that the Batson three step inquiry is only appropriate to adjudicate contemporaneous objections during the voir dire, where the prosecutor can state his or her non-discriminatory reasons before the jury is empaneled.  While the United States Court of Appeals for the Second Circuit reached this result in McCrory v. Henderson, 82 F.3d 1243 (2d Cir. 1996), no other Circuit has so held.  Moreover, no others – including the United States Court of Appeals for the Third Circuit – limit the Batson burden shifting analysis to the actual trial setting.  As the Third Circuit has applied the test of Batson in other "after the fact" examinations of the Equal Protection implications of race-based prosecutorial peremptory strikes, see, e.g., Hardcastle v. Horn, 368 F.3d 246 (3d Cir. 2004), we find that Circuit precedent requires that we employ the Batson test.

[10]We previously found that Lark established step-one's prima facie case.  Lark v. Beard, No. Civ. A. 01-1252, (E.D. Pa. May 23, 2006), slip op. at 17.  Having now heard evidence, we reiterate that Lark has met his step-one burden based upon the actual composition of the venire, and the pattern of strikes exercised by the Commonwealth.

Commonwealth must articulate a race-neutral explanation for striking minority members of the venire.   This burden of production is not high; the Commonwealth need not produce "'an explanation that is persuasive, or even plausible.'  Rather, the sole issue at step two 'is the facial validity of the prosecutor's explanation.   Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'"  Hardcastle, 368 F.3d at 257 (quoting Purkett, 514 U.S. at 767-68).   However, a general denial of discrimination is not enough to satisfy the Commonwealth's burden at step two.  Johnson v. Love, 40 F.3d 658, 668 (3d Cir. 1994).   The burden imposed by Batson requires articulating "a 'clear and reasonably specific' explanation of [the prosecutor's] 'legitimate reasons' for exercising the challenges."  Batson, 476 U.S. at 98, n. 20 (quoting Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981)).

"[C]ircumstantial as well as direct evidence can be used to carry the state's burden of production at the second step in a Batson analysis."  Johnson, 40 F.3d at 668.  Batson does, however,

> require that the state's evidence, direct or circumstantial, be such that, if credited, it will establish that invidious discrimination played no role in the prosecutor's challenge.   Stated conversely, the Batson inquiry ends and the conviction must be vacated at the second stage of the analysis if the state's explanation is such that, taken at face value, it either demonstrates an equal protection violation . . . or would otherwise be inadequate as a matter of law to support the conviction."

Johnson at 668 (internal citation omitted).   While the Third Circuit has held that the exclusion of even one minority venireman from the jury on the basis of race is sufficient to require a new trial pursuant to Batson, see Harrison v. Ryan, 909 F.2d 84, 88 (3d Cir. 1990), it has also "expressly rejected the notion that our prior precedent mandates relief in situations in which the prosecutor concedes that he or she cannot remember the bases for a challenged strike."  Hardcastle, 368 F.3d at 260 (citing Johnson, 40 F.3d at 667 n.4 (distinguishing Harrison because "[w]e do not read

-22-

Harrison to suggest that a state cannot be permitted to reconstruct the prosecutor's rationale for excluding a juror during a later Batson hearing when the prosecutor admits to having no recollection of his motivations at the time.")).[11]

Thus, an attempt by the Commonwealth to reconstruct the decision-making process through circumstantial evidence is permissible, so long as the evidence presented is supported by the record. Riley, 277 F.3d at 279 (holding that a court is not required to accept a race neutral explanation that is not supported by the record). We find that, although Assistant District Attorney Carpenter had no independent or refreshed recollection of his reasons for striking particular veniremen, the evidence of the factors he commonly employed in making jury selection decisions, combined with his attempt to reconstruct his reasons for making particular strikes based on applying those factors to his contemporaneous reading of the state court voir dire transcript, constitutes circumstantial evidence of his intent in exercising the Commonwealth's peremptory strikes.   Carpenter's testimony, identifying factors that he typically would have taken into account in exercising a peremptory strike, is admissible under Fed. R. Evid. 406.  The Rule provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity

---

[11]In Hardcastle, the Third Circuit affirmed its holding in Harrison that when a prosecutor can offer no explanation for a peremptory strike due to a failure to remember, the Commonwealth fails to meet its burden at step two. See id. at 255 (holding that the Pennsylvania Supreme Court "failed to identify adequate bases for the striking of Venirepersons 11 and 12, and thus should have terminated its analysis and found the existence of a Batson violation at step two of the inquiry" despite the articulation of neutral reasons for the ten other challenged strikes).  In Hardcastle, however, the Commonwealth had never been granted an opportunity to present its race neutral reasons in state court.  The Third Circuit held that Harrison did not prevent the Commonwealth from attempting to "reconstruct" the voir dire during a later habeas hearing despite the prosecutor's previous failure to recall her motivations.  Hardcastle, 368 F.3d at 260.

with the habit or routine practice.

Habit "describes one's regular response to a repeated specific situation." Fed. R. Evid. 406 advisory committee note (describing conduct that qualifies as habit as "semi-automatic"). It is defined as "a regular practice of meeting a particular kind of situation with a certain type of conduct, or a reflex behavior in a specific set of circumstances." Perrin v. Anderson, 784 F.2d 1040, 1046 (10th Cir. 1986) (quoting Frase v. Henry, 444 F.2d 1228, 1232 (10th Cir. 1971)). At step two of the Batson analysis, we are concerned solely with the admissibility of such evidence, as we take the state's evidence at face value. See Johnson, 40 F.3d at 668. In order to determine the reliability of this evidence, we would examine the invariability of the conduct: (1) the degree to which the conduct is reflexive or semi-automatic as opposed to volitional; (2) the specificity or particularity of the conduct; and (3) the regularity or numerosity of the examples of the conduct. See United States v. Angwin, 271 F.3d 786, 799 (9th Cir 2001); Weil v. Seltzer, 873 F.2d 1453, 1460 (D.C. Cir. 1989); Simplex, Inc. v. Diversified Energy Sys., Inc., 847 F.2d 1290, 1293-94 (7th Cir. 1988). We do not, however, weigh the reliability of the prosecutor's habit evidence until step three of the Batson analysis, at which step we determine the persuasiveness of the prosecutor's justifications for his strikes. Hardcastle, 368 F.3d at 258 (citing Purkett, 514 U.S. at 768). Nonetheless, we are constrained to find that the Commonwealth has not met its burden at step two of Batson.

Carpenter could not articulate **any** race neutral justification for his peremptory strikes of Shirley Sampson, Florence Williams and Edison Cisco. This alone mandates a finding that the Commonwealth has failed to meet its burden. See Hardcastle, 368 F.3d at 257 n.4 (stating that the Pennsylvania Supreme Court's failure to identify a satisfactory step two explanation for the striking of certain veniremen, even where it could offer justifications for other strikes that were facially valid,

-24-

was an objectively unreasonable application of <u>Batson</u>'s step two burden); <u>Riley</u>, 277 F.3d at 282 (reiterating that a prosecutor's failure to recall his reason for exercising a peremptory strike does not constitute a race-neutral explanation) (citing <u>Harrison</u>, 909 F.2d at 87).  Where a state fails to meet its <u>Batson</u> duty of production at step two, the analysis ends with a finding of the existence of a <u>Batson</u> violation.

## VII.   REMEDY

Because the totality of the relevant facts demonstrate that the Commonwealth has failed to meet its burden of articulating race neutral grounds for its peremptory strikes of at least three African-American veniremen in Lark's trial, habeas relief is appropriate and mandated.  Thus we conditionally grant the writ, vacate Lark's convictions, and allow the Commonwealth of Pennsylvania to retry Petitioner within 180 days of the date of the accompanying order.

An appropriate order follows.[12]

---

[12]Because we conclude that habeas relief must be ordered based on the Commonwealth's inability to meet its burden at step two of the <u>Batson</u> three step analysis, we do not reach the issue of whether Lark's statistical evidence – offered to prove step three of the burden shifting process by analyzing how the peremptory strikes in his case correlated with the instructions in the McMahon Tape – is appropriate.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT LARK,
    Petitioner,

**FILED**

JUL - 3 2007

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

CIVIL ACTION

(DEATH PENALTY
HABEAS CORPUS)

v.

JEFFREY BEARD, ET AL.,
    Respondents

NO. 01-1252

## O R D E R

**AND NOW**, this ___ day of July, 2007, upon consideration of the Petition for Writ of Habeas

Corpus (Docket No. 1), the Response of the Commonwealth of Pennsylvania (Docket No. 16), all

documents filed in connection therewith, and the evidentiary hearing held on November 8-9, 2006,

**IT IS HEREBY ORDERED** that the Petition for Writ of Habeas Corpus is **GRANT ED**.

    **IT IS FURTHER ORDERED** that Petitioner's convictions in <u>Commonwealth v. Lark</u>, No.

2012-22, January Term, 1980 (C.C.P. Phila., John A. Geisz, J.), are **VACATED**.   The

Commonwealth of Pennsylvania may retry Petitioner within 180 days of the date of this Order.

    **IT IS FURTHER ORDERED** that Petitioner's Motion in Limine (Docket No. 53) is

**DISMISSED AS MOOT**.

    The Petitioner having made a substantial showing of the denial of a constitutional right, a

certificate of appealability is **GRANTED** as to all issues, pursuant to 28 U.S.C. § 2253.

        BY THE COURT:

_____
John R. Padova, J.