IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT LARK, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | (DEATH PENALTY |
| v. | : | HABEAS CORPUS) |
| | : | |
| JEFFREY BEARD, ET AL., | : | NO. 01-1252 |
| Respondents | : | |

**MEMORANDUM**

**Padova, J.**                                                    **July 30, 2012**

**I.    INTRODUCTION**

Before the Court for the second time is Robert Lark's Petition for Writ of Habeas Corpus

filed pursuant to 28 U.S.C. § 2254.  On July 3, 2007, we conditionally granted the Petition, finding

that the Commonwealth of Pennsylvania failed to satisfy its burden at the second step of the analysis

established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79 (1986).[1]  See

Lark v. Beard, 495 F. Supp. 2d 488, 503 (E.D.Pa. 2007) ("Lark I") *vacated sub nom* Lark v.

Secretary, Pa. Dept. of Corr., 645 F.3d 596 (3rd Cir. 2011)  ("Lark II").  On June 16, 2011, the

United States Court of Appeals for the Third Circuit vacated our Order granting the Petition.  Lark

---

[1]In Batson, the Supreme Court held that deliberate or purposeful exclusion of African Americans from jury service violates the Equal Protection Clause.  Id., 476 U.S. at 84.  The decision set forth a three-step procedure for evaluating claims of discrimination in the jury selection process:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race.  Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.  Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Miller–El v. Cockrell, 537 U.S. 322, 328-29 (2003) ("Miller-El I") (discussing three-step inquiry (citing Batson, 476 U.S. at 96–98)).

II, 645 F.3d at 629.  The Commonwealth did not challenge our finding that Lark established a *prima facie* case at step one, but confined its challenge to our holding that Lark was entitled to the entry of the conditional writ of habeas corpus because the Commonwealth had not articulated a race-neutral explanation for its strikes at step two.  Id. at 620-21.  The Third Circuit determined that, notwithstanding the Commonwealth's failure to meet its step two burden of demonstrating a race-neutral ground for its peremptory strike of a minority veniremen, the burden remains on Petitioner to show by a preponderance of the evidence at step three that the prosecutor engaged in purposeful discrimination.  Lark II, 645 F.3d at 625-27 (analyzing Johnson v. California, 545 U.S. 162 (2005) and explaining that the prosecutor's lack of response at step two is evidence to be taken into account at step three, but is not, by itself, of such dispositive force that it establishes that there was a Batson violation).  Presently before the Court are the parties' additional submissions on the step three issues. We find that Petitioner has satisfied his burden of demonstrating by a preponderance of the evidence that the prosecutor engaged in purposeful discrimination in striking African-American veniremen from his jury.  Accordingly, we again conditionally grant the writ.

I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Third Circuit fully set forth the factual basis for Lark's conviction and the direct and collateral appeal history in Lark II, 645 F.3d at 599-606, which we incorporate by reference herein. To summarize, Petitioner was convicted of first degree murder, possession of an instrument of crime, terroristic threats, and kidnaping in the Court of Common Pleas of Philadelphia County on June 28, 1985, and was subsequently sentenced to death.  The convictions resulted from Lark's killing of Tae Bong Cho, and his kidnaping and restraint of Cho's two young children and their mother.  Petitioner appealed, and the Supreme Court affirmed his convictions and sentences on May 20, 1988.  See

-2-

Commonwealth v. Lark, 543 A.2d 491 (Pa. 1988).

Following extensive state collateral proceedings, Lark filed the instant petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2244, on March 16, 2001, alleging an Eighth Amendment ineffective assistance of counsel claim in connection with both the guilt and penalty phases of his trial, as well as a Fourteenth Amendment Equal Protection claim. Lark II, 645 F.3d at 602 n.9. After determining that Petitioner alleged facts that, if true, would satisfy his Batson step one burden by making a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race, we conducted an evidentiary hearing. Id. at 603.

To support its step two burden, we permitted the Commonwealth to present circumstantial evidence to reconstruct the prosecutor's peremptory strike decision-making process. The prosecutor, having first testified that he had no current recollection of the Lark jury selection, nor any independent or refreshed recollection of the voir dire after having read the voir dire transcript, Lark I at 495, was allowed to testify to his practice of considering certain criteria in exercising peremptory challenges. He identified the following factors that he routinely considered and the reason he considered that factor significant: (1) the neighborhood where the potential juror lived was significant to his decision to exercise a peremptory strike because he did not want jurors who lived near the defendant or near to where the incident occurred (N.T. 11/8/06 at 73-74); (2) the potential juror's employment status, because persons with a job have roots in the community (id. at 82); (3) the potential juror's age, because older jurors are wiser and more responsible (id. at 94); (4) whether the potential juror had relatives that were police officers, which he considered a positive factor (id. at 95); (5) the potential juror's home ownership, because it showed a stake in the community (N.T. 11/9/06 at 10); (6) vocation – he did not want teachers and social workers as jurors (id.); (7) hardship

-3-

(id. at 48); (8) prior jury experience (id.); (9) whether the juror had been a victim of crime or a witness or defendant in a criminal case (id.); (10) whether the juror knew any potential witness in the trial (id.); (11) whether the juror had any feelings about the death penalty (id.); and (12) whether the potential juror had children the same age as the defendant (N.T. 11/8/06 at 102). The prosecutor denied striking any juror because of his or her race. (N.T. 11/9/06 at 51.) He testified that using race as a factor in jury selection was legally and morally abhorrent to him. (N.T. 11/8/06 at 71-72.)

The prosecutor also testified as to why he thought he may have stricken certain members of the venire, based upon his review of the voir dire transcript. However, even after he reviewed the transcript, the prosecutor could state no reason for striking three African-American veniremen: Shirley Sampson, Florence Williams, and Edison Sisco. Lark II, 645 F.3d at 604-05. We determined in Lark I that the Commonwealth's failure to satisfy its burden of production with respect to the prosecutor's peremptory strikes of Sampson, Williams, and Sisco at step two of the Batson analysis mandated the granting of the writ. Lark I at 503. The Third Circuit agreed that the Commonwealth failed to satisfy its burden of production at step two, Lark II, 645 F.3d at 603; however, the Third Circuit disagreed with our conclusion that the Commonwealth's failure at step two warranted granting the writ. Id. at 626-28. The Third Circuit indicated that, where the passage of time has diminished the prosecutor's recollection of the voir dire, the district court should proceed to the third step of the Batson analysis. Id. at 628.

II.   STEP THREE OF THE BATSON ANALYSIS

In Williams v. Beard, 637 F.3d 195 (3d Cir. 2011), the Third Circuit restated the law applicable to step three:

> At step three of the Batson analysis, the petitioner must show that "it is more

-4-

likely than not that the prosecutor struck at least one juror because of race." <u>Bond</u> [v. Beard, 539 F.3d 256 (3d Cir. 2008)] at 264.  To determine whether the petitioner has carried his or her burden, the court must evaluate "all evidence introduced by each side (including all evidence introduced in the first and second steps) that tends to show that race was or was not the real reason" for each strike.  <u>Hardcastle [v. Horn</u>, 368 F.3d 246 (3d Cir.2004)] at 259 (quoting <u>Riley v. Taylor</u>, 277 F.3d 261, 286 (3d Cir. 2001) (en banc)); <u>see also</u> <u>Snyder v. Louisiana</u>, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (explaining that "all of the circumstances that bear upon the issue of racial animosity must be consulted").  Step three ultimately focuses upon the prosecutor's subjective motivation, which ideally includes an assessment of the demeanor and credibility of the various voir dire participants.  <u>See</u> <u>Snyder</u>, 552 U.S. at 477, 128 S.Ct. 1203 ("Step three of the <u>Batson</u> inquiry involves an evaluation of the prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenges." (alteration in original) (internal citations and quotation marks omitted)).

<u>Williams</u>, 637 F.3d at 215-16.  As this discussion makes clear, a key part of our analysis at step three will be determining whether or not we accept the prosecutor's assertion that race played no part in his decision making process.  In making this determination, we consider the entire record, including the statistical evidence Petitioner introduced at step one, <u>see id.</u> at 214 (noting that statistical evidence may be sufficient by itself to make out a *prima facie* case of racial discrimination at step one, citing <u>Jones v. Ryan</u>, 987 F.2d 960, 971 (3d Cir. 1993)), as well as the evidence offered by the Commonwealth at step two, to show what factors the prosecutor ordinarily considered in making peremptory strike decisions.  "An explanation that appears race neutral at step two may betray an improper motive if it is invoked to strike African Americans but not other non-black venirepersons exhibiting the same characteristic." <u>Id.</u> at 216.

At step three, we also examine "comparator" evidence, "comparing stricken members of the venire to individuals the Commonwealth deemed acceptable."  <u>See id.</u> ("We have previously authorized such an evaluative procedure, explaining, 'A comparison between a stricken black juror and a sitting white juror is relevant to determining whether the prosecution's asserted justification

for striking the black juror is pretextual.'") (quoting <u>Riley</u>, 277 F.3d at 282; <u>Holloway v. Horn</u>, 355

F.3d 707, 724 (2004)); <u>see also</u> <u>Snyder</u>, 552 U.S. at 479–86, 128 S.Ct. 1203 (performing comparative

analysis); <u>Miller–El v. Dretke</u>, 545 U.S. 231, 241–52 (2005) ("<u>Miller-El II</u>") (finding <u>Batson</u>

violation based in part on juror comparison evidence).

> The Third Circuit in <u>Williams</u> stated that, when conducting a comparison analysis,
>
> it is insufficient to proffer venire members who lack one or more of the characteristics upon which the prosecutor exercised a strike.  This is not to erect an unreasonable roadblock; rather, it ensures accuracy in an area often guided by guesswork and hunches.  See [<u>United States v.</u>] <u>DeJesus</u>, [347 F.3d 500 (2003)] at 505 (explaining that a peremptory challenge "is usually based on educated guesses about probabilities based on the limited information available to an attorney about prospective jurors").  Because the focus in step three is to uncover a prosecutor's subjective motivation, it is imperative to account for the complete combination of factors that caused the prosecutor to exercise a strike.

<u>Williams</u>, 637 F.3d at 217.  The comparator evidence in <u>Williams</u> was held to be unpersuasive,

however, because the petitioner could identify no comparators that met all of the criteria exhibited

by the stricken veniremen.  <u>Id.</u>  However, as the Supreme Court explained in <u>Miller-El II</u>, there is

no *per se* rule "that no comparison is probative unless the situation of the individuals compared is

identical in all respects, and there is no reason to accept one. . . .  A *per se* rule that a defendant

cannot win a <u>Batson</u> claim unless there is an exactly identical white juror would leave <u>Batson</u>

inoperable; potential jurors are not products of a set of cookie cutters."  <u>Id.</u> at  at 247 n.6; <u>see also</u>

<u>Snyder</u>, 552 U.S. at 483 (finding that the prosecutor's acceptance of white jurors who disclosed

information "at least as serious" as that disclosed by stricken African-American juror made

prosecutor's reliance on that factor implausible).

III.    DISCUSSION[2]

Petitioner argues, based upon the trial record of the voir dire and the evidence adduced at our evidentiary hearing, that it is more likely than not that the Commonwealth engaged in purposeful discrimination in the exercise of peremptory strikes against African-American veniremen.   To support his argument Petitioner relies upon (a) a statistical analysis of the prosecutor's peremptory strikes, (b) comparisons among jurors, and (c) the prosecutor's comments when Petitioner's attorney objected to his pattern of peremptory strikes.[3]

    A.    Pattern of strikes

        1.    Strike rates and acceptance rates

_____

[2]In Lark I, we made extensive findings of fact in deciding the Batson step two issue.  The discussion which follows of the state court record and the record of the evidentiary hearing constitute additional findings of fact.  In addition, we have created and appended hereto a spreadsheet ("App. 1"), in which we correlate from the voir dire testimony and the parties' stipulations, the race, demographic information, and peremptory challenge criteria of the 29 members of the venire actually subject to a peremptory challenge decision by the prosecutor.  The contents of the spreadsheet and the discussion in this opinion of the data compiled therein likewise constitute additional findings of fact.

[3]Petitioner also asks us to consider the "McMahon Tape" as demonstrating the culture of discrimination in the Philadelphia District Attorney's Office at the time of his trial.  On this tape, an assistant in the Philadelphia District Attorney's Office tutored his colleagues in methods of avoiding Batson claims while still limiting the number of African-Americans chosen as jurors in criminal trials.  We previously found as fact that the prosecutor knew the creator of the tape, Jack McMahon, but that McMahon was never his supervisor or senior in the District Attorney's Office and he never gave him instructions on how to pick a jury.  Lark I at 494.  We also found that Petitioner's jury selection occurred prior to the creation of the McMahon Tape.  Id.
    Petitioner concedes that "the Third Circuit has been unwilling to put much weight upon McMahon's remarks when another prosecutor tried the case . . . [n]evertheless, the relationship between [the prosecutor's] testimony and the McMahon video is worth noting."  (Pet. Mem. at 20-21.)  He further points out several similarities between the strategies taught by McMahon and the prosecutor's actions here.  Despite Petitioner's urging, since we find that the other evidence Petitioner presents is sufficient to support our conclusion that it is more likely than not that African-American veniremen were peremptorily struck on account of their race, we have not considered the "McMahon Tape" evidence.

The parties stipulated to the racial composition of the venire from which Petitioner's jury was selected. Lark II, 645 F.3d at 605-06. After all veniremen excused for cause or by consent[4] are excluded, the jury, which totaled 14 people, including the two alternates, was selected from a venire consisting of 45 people. Of those 45 people, the prosecutor had the opportunity to accept or strike 29 veniremen before the jury was filled. Of these 29 people, 17 were African-American and 12 were Caucasian. (App. 1.) The prosecutor exercised 15 peremptory strikes. (Id.) Of those 15 strikes, 13 were used to strike African-American veniremen – resulting in an 87% strike rate. (Id.; Lark II at 606). He used two strikes against Caucasian veniremen – a 13% strike rate. (Id.)[5] The prosecutor accepted only four of the 17 African-American jurors he had the opportunity to accept – for an acceptance rate of 23.5%; he accepted 10 of the 12 Caucasian jurors he had the opportunity to accept – for an acceptance rate of 83%. (Id.)

The Commonwealth argues that this evidence does not establish at step three that any particular strike was the product of discrimination. First, it notes that four African-Americans were seated as jurors, which, it argues, lends credibility to the prosecutor's testimony that he was not excluding jurors because they were African-American. (Resp. at 3-4 citing DeJesus, 347 F.3d at 509 (stating that the fact that one Hispanic and three African Americans were seated in the final jury, while the government had three unused three peremptory strikes, makes the government's

---

[4]There has been no stipulation or evidence presented on the race of those veniremen stricken for cause or by consent.

[5]Based upon our own review of the voir dire record, we vacate our prior Finding of Fact No. 47, see Lark I, 495 F. Supp. 2d at 499 (citing Stipulation #1 for the proposition that the prosecutor struck 71% (12 of 17) of the available African-American venire members and struck only 17% (3 of 18) of the non-African-American veniremen) to the extent that it is inconsistent with this paragraph.

race-neutral explanation more believable)).

The Commonwealth also asks us to consider another statistic – the prosecutor's acceptance rate – which it contends is more "benign."  (Resp. at 4.)  As noted, of the 17 African-Americans that the prosecutor had the opportunity to accept or strike, he accepted four, or about 23.5%.  We consider the African-American acceptance rate, along with all of the other evidence, as relevant to the step three determination.  However, a comparison with the prosecutor's acceptance rate for Caucasian jurors, 10 out of 12 or 83%, is also evidence we consider.

Third, the Commonwealth notes that there is no evidence concerning the race of the entire venire or the race of jurors struck by the defense.  It contends that, in the absence of this evidence there is no way to accurately calculate the overall exclusion rate, i.e., to compare the racial makeup of the entire venire with the racial makeup of the seated jury.  See United States v. Gooch, 665 F.3d 1318, 1327, 28 (D.C. Cir. 2012) (stating "When the 'jury composition mirror[s] the make-up of the venire' and 'the prosecutor's strikes [do] not skew the racial composition of the resulting jury,' '[t]he circumstances . . . are a far cry from the facts of cases in which the Supreme Court has found a Batson violation.'" (quoting United States v. Moore, 651 F.3d 30, 41 (D.C. Cir. 2011) (per curiam))).  It asserts that Petitioner's failure to establish the racial makeup of the entire venire is an independent reason why his Batson claim fails because the exclusion rate is necessary for reliable assessment of the statistical evidence.  (Resp. Mem. at 5 (citing Lewis v. Horn, 581 F.3d 92, 103 (3d Cir. 2009)).

The Commonwealth's reliance on Lewis is, however, misguided.  The Lewis court was discussing Batson's step one requirements, not step three, and Lewis's claim failed because he had no evidence to support his allegations that 66.6% of the members of the venire stricken by the prosecutor were African-American.  Id. at 103-04.  The Lewis Court also stated that the exclusion

rate is not absolutely necessary to satisfy Batson's step one requirements.  Lewis at 103 (stating "In Abu-Jamal [v. Horn, 520 F.3d 272 (3d Cir. 2008)] we emphasized the importance (although not necessity) of supplying information about the strike rate and the exclusion rate in order to demonstrate a *prima facie* violation of Batson") (parenthetical in original).  Moreover, we are required when we determine whether the Petitioner has satisfied his burden at step three to evaluate "all evidence introduced by each side (including all evidence introduced in the first and second steps) that tends to show that race was or was not the real reason" for each strike.  Williams at 215 (quoting Hardcastle, 368 F.3d at 259).  Focusing solely on the failure to establish the "overall" exclusion rate would violate this principle.

The Commonwealth also argues that Petitioner's strike and acceptance statistics evidence fails to meet his step three burden because in four recent cases, all decided after we issued Lark I, the Third Circuit rejected Batson claims that cited similar statistical evidence.  First, we reject the inference that these cases mandate that Petitioner's statistical evidence should be viewed in isolation from all other material evidence at step three.  As just stated, we must look to the totality of the evidence to determine whether race was or was not the real reason for each strike.  Second, we find that none of the four cases mandate a conclusion that it is more likely than not that Petitioner cannot demonstrate racial discrimination in jury selection in this case.

The first case on which the Commonwealth relies is Williams, 637 F.3d 195.  In Williams, the prosecutor accepted five of the 19 African Americans she had the opportunity to strike, for an acceptance rate of 26.3%.  By contrast, her acceptance rate of white veniremen was 90%.  Id. at 215. The Third Circuit found that the variation in the prosecutor's acceptance rates for African-American and Caucasian veniremen was sufficient to establish a *prima facie* showing of racial discrimination

at step one.  Id.  However, the Court concluded that the comparison evidence presented by the petitioner was insufficient to establish that the prosecutor's race-neutral explanations for her strikes were pretextual.  Id. at 216-19.  The Third Circuit concluded that Williams's Batson challenge failed on its merits at step three because the totality of petitioner's proofs – not just the statistics – did not overcome the prosecutor's stated non-discriminatory reasons for her strikes.  Id. at 219-220.

Similarly, in the second decision cited by the Commonwealth, Lewis, 581 F.3d 92, the petitioner claimed that the prosecutor exercised eight of his 12 peremptory strikes against African-Americans, for a strike rate of 66.67%.  Id. at 104.  Further, petitioner alleged he was tried by an all-Caucasian jury.  Id.  The Third Circuit found that petitioner had not made out a step one *prima facie* case of discrimination because he had not cited to any record evidence or any other support outside the record, to substantiate his bare allegations.  Id. (stating "Without information about the number and racial composition of the entire venire, we cannot calculate the exclusion rate and we lack the 'contextual markers' to analyze the significance of the strike rate.").  The Court further stated that, even if it accepted as true "Lewis's bald assertion that eight of the twelve venire members whom the prosecutor struck were African-American, a strike rate of 66.67% is insufficient information to establish a prima facie case of racial discrimination in the exercise of peremptory strikes."  Id.  Here, in contrast, Petitioner identified the race of the 29 veniremen for whom the prosecutor exercised a choice, the prosecutor's strike rate of African-Americans was significantly greater than 66.67%, and Petitioner has presented other evidence on the step three issue.  Thus, both Williams and Lewis have little application to this case.

Next, the Commonwealth relies upon Abu-Jamal, 520 F.3d 272.  In Abu Jamal, the prosecution strike rate of African-Americans was 66.67% with three African-Americans chosen as

jurors.  Id. at 287, 291.  While the Commonwealth asserts that the decision "emphasized the difficulty of evaluating the *significance* of the strike rate without knowing the racial makeup of the venire, from which the exclusion rate might be calculated," (Resp. Mem. at 7 (emphasis in original) (citing Abu-Jamal, 520 F.3d at 290-92)), this was not the import of the opinion.  In a decision governed by the AEDPA, the Third Circuit determined the state court rejection of the Batson claim was not unreasonable in part because petitioner had the opportunity to question the prosecutor about his striking African-American veniremen at a hearing in state court and failed to do so.  Id. at 292.  Because Abu Jamal failed to adequately develop the record when he had that opportunity, the Third Circuit concluded that the state court finding that he had not made out a *prima facie* case at step one was a reasonable interpretation of Batson.  Id.

Lastly, the Commonwealth relies upon Bond, 539 F.3d 256.  In Bond, the prosecution strike rate of African-Americans was 78.6% with four African-Americans chosen as jurors (two were alternates).  Id. at 269.  The Commonwealth asserts that this case stands for the proposition that "raw statistics do not provide a clear picture of intentional racial discrimination."  (Resp. Mem. at 7 (quoting  Bond, 539 F.3d at 269)).  While this quote is correct, it has been taken out of context.  In fact, while the Third Circuit was acknowledging that this statistic was mitigated by the fact that the percentage of African-Americans on the jury was actually higher than the percentage of African-Americans in one of the two venire panels considered by counsel during Bond's jury selection, that was not the sole basis for the Bond Court's conclusion that the petitioner had failed to meet his obligations under step three.  Id. at 269-275.   In Bond, the prosecutor offered contemporaneous non-discriminatory reasons for his strikes and the trial court made findings that these were not pretextual.  Id. at 271-72. On habeas review, the Third Circuit afforded deference to these holdings.

Here, we deal in large part with stricken jurors for whom the prosecutor could identify no non-discriminatory reasons for his strikes apparent from the voir dire transcript.  Because none of the four decisions the Commonwealth cites mandates a conclusion that Petitioner's statistical evidence should not be reviewed in connection with his step three burden, we treat the prosecutor's strike rate and acceptance rate statistics as part of the totality of evidence tending to show whether or not race was the real reason for each strike.

> 2.    Analysis of the prosecutor's jury selection criteria

To support its step two burden, we permitted the Commonwealth to present circumstantial evidence to reconstruct the prosecutor's peremptory strike decision-making process.  This evidence is also relevant at step three.  Hardcastle, 368 F.3d at 259.  In addition to relying upon the fact that the prosecutor could state no reason whatsoever for striking at least three African-American veniremen, Petitioner argues that our factual findings, along with the testimony of record from the voir dire, support the step three conclusion that the prosecutor engaged in purposeful discrimination because the record demonstrates that the prosecutor applied the factors he identified differently to African-American and Caucasian veniremen.  We will first review each factor to determine whether the prosecutor applied them in a race-neutral fashion.

> A.    Neighborhood where the incident took place (North Philadelphia)

The prosecutor testified that he routinely considered whether a potential juror lived near the location of the crime.  (N.T. 11/8/06 at 73-74.)  The crime in this case occurred in North Philadelphia.  (N.T. 6/5/85 at 29.)  There were several veniremen stricken by the Commonwealth who currently or formerly lived in North Philadelphia (Sampson, Geter, Traynham, Wilson, S. Williams).  (App. 1.)  There were no veniremen who currently or formerly lived in North

Philadelphia who were not stricken by the Commonwealth.  (Id.)  We conclude that the prosecutor applied this factor consistently.

                B.      Employment status as proxy for roots in the community

The prosecutor testified that he routinely considered whether a potential juror was employed. (N.T. 11/8/06 at 82.)  The prosecutor accepted three of the four unemployed veniremen who were Caucasian.  (App. 1 (Petruzelli, Kostryckyj, Mancini seated; Landis struck).)  However, he accepted only one of the seven African-American veniremen who were unemployed.  (Id. (Sheen seated; Cooper, Geter, F. Williams, Traynham, Lewis, Jefferson struck).)  He accepted seven of the eight Caucasians who were employed.  (Id. (Longo, Giorgio, Merrill, Arentzen, Hawthorne, Hamski, Caione seated; Rabb struck).)  However, he accepted only three of the 10 African-Americans who were employed.  (Id. (Alston, Robinson, Hill seated; Sampson, Green, Wilson, Patton, Sisco, S. Williams, Erby struck).)  We conclude that there are racial variances in the prosecutor's application of his stated preference for employed jurors.

                C.      Preference for older jurors

The prosecutor testified that he routinely considered a potential juror's age, as he believed that older jurors were wiser and more responsible.[6]  (N.T. 11/8/06 at 94.)  The prosecutor accepted three of the four Caucasian veniremen who had the positive attribute of being older.  (App. 1 (Giorgio, Petruzelli, Hawthorne seated; Rabb struck).)  He accepted only three of the 14 African-

---

[6]While many veniremen were not asked to state their age during the voir dire, counsel would have been able to determine their general age from their appearance.  Where a venireman's age is not specified in the record, we have extrapolated whether the venireman was an older or younger person based upon their voir dire testimony, i.e., the age of their children, that they were retired, or the year they graduated from school.  By examining the testimony, we have been able to determine a general age for each venireman and have classified them in App. 1 as either "older" or "younger."

American veniremen who were older.  (<u>Id.</u> (Alston, Robinson, Hill seated; Sampson, Green, Geter, F. Williams, Traynham, Wilson, Sisco, S. Williams, Lewis, Jefferson, Erby struck).)  The prosecutor accepted seven of the eight Caucasians who possessed the negative attribute of being younger.  (<u>Id.</u> (Longo, Merrill, Arentzen, Hamski, Caione, Kostryckyj, Mancini seated; Landis struck).)   He accepted only one of the three African-Americans who were younger.  (<u>Id.</u> (Sheen seated; Cooper, Patton struck).)  We conclude that there  are racial variances in the prosecutor's application of his stated preference for older jurors.

D.   <u>Positive connections to police officers</u>

The prosecutor testified that he routinely exercised a preference for jurors with positive familial or social connections to police officers.  (N.T. 11/8/06 at 95.)  He accepted all three of the veniremen with positive police connections who were Caucasian.  (App. 1. (Merrill, Arentzen, Hawthorne.))   However, he accepted only three of the five African-American veniremen with positive police connections.  (<u>Id.</u> (Alston, Robinson, Sheen seated; Wilson, Patton struck).)  The prosecutor accepted seven of the nine Caucasians with no positive police connections.  (<u>Id.</u> (Longo, Giorgio, Petruzelli, Hamski, Caione, Kostryckyj, Mancini seated; Rabb, Landis struck).)   He accepted only one of the 12 African-Americans with no positive police connections.  (<u>Id.</u> (Hill seated; Sampson, Green, Cooper, Geter, F. Williams, Traynham, Sisco, S. Williams, Lewis, Jefferson, Erby struck).)   We conclude there are racial variances in the prosecutor's application of his stated preference for jurors with a positive familial or social connections to police officers.

E.   <u>Home ownership as proxy for stake in the community</u>

The prosecutor also testified that home ownership was a positive factor in his consideration of potential jurors because it demonstrated a stake in the community.  (N.T. 11/9/06 at 10.)

-15-

Nevertheless, only nine veniremen were asked about their ownership of a home and all of those nine veniremen were asked about home ownership by defense counsel. (App. 1 (Giorgio, Merrill, Sampson, Green, Petruzelli, Geter, Landis, Hawthorne, Jefferson).) Because the prosecutor did not pursue this inquiry, we do not rely upon his testimony that home ownership was a factor that he used in making his decisions.

F.     Significant negative vocations

The prosecutor testified that he considered certain vocations to be significant and negative factors, and specified that he did not want teachers and social workers as jurors. (N.T. 11/9/06 at 10.) However, he accepted Amelia Hill, an African-American social work supervisor employed by the Philadelphia County Board of Assistance for the jury. (App. 1.) No other veniremen worked at one of these specified vocations. We do not find that the prosecutor's application of this factor implies racial discrimination because the juror who possessed this characteristic was African-American and was accepted by the prosecutor.

G.     Prior jury experience

The prosecutor did not express either a preference or a dislike for jurors who had previously served on a jury; he merely stated it was a factor he considered. (N.T. 11/9/06 at 48.) Only four veniremen expressed that they had prior jury experience. Two were Caucasian and both were seated. (App. 1 (Merrill, Hawthorne).) Two were African-American; one was seated, the other was stricken by the Commonwealth. (Id. (Hill seated; F. Williams struck).) We cannot conclude that the prosecutor applied this factor in a discriminatory fashion based on the record before us.

H.     Victims or witnesses of a crime

Like prior jury experience, the prosecutor did not express either a preference or a dislike for

-16-

jurors who were victims or witnesses to crimes; he merely stated it was a factor he considered.  (N.T. 11/9/06 at 48.)  The prosecutor accepted six of the seven Caucasian veniremen who self-identified as being a witness or victim of crime.  (App 1 (Longo, Giorgio, Arentzen, Hawthorne, Hamski, Mancini seated; Rabb struck).)  He accepted only one of the two African-American veniremen in that category.  (Id. (Hill seated; Wilson struck).)  He accepted four of the five Caucasians who did not self-identify as being a witness or victim of crime.  (Id. (Merrill, Petruzelli, Caione, Kostryckyj seated; Landis struck).)  He accepted only three of the 13 African-Americans in that category.  (Id. (Alston, Robinson, Sheen seated; Sampson, Green, Cooper, Geter, F. Williams, Traynham, Patton, Sisco, S. Williams, Jefferson struck).)  We conclude there are racial variances in the prosecutor's acceptance and rejection of jurors based upon this factor.

### I.   Defendant in a criminal case

The prosecutor testified that he considered whether a potential juror or family member had been a defendant in a criminal case.  (N.T. 11/9/06 at 48.)  Only four veniremen not stricken for cause stated that they or a family member were a defendant in a criminal case.  Three were African-American and were all peremptorily stricken by the Commonwealth.  (App 1 (Wilson, Lewis, Erby).)  One was Caucasian and was seated.  (Id. (Hawthorne).)  While the sample size is small, we conclude there is a stark racial disparity in the prosecutor's application of what would appear to be an important voir dire subject.

### J.   Veniremen with children the same age as the defendant

The prosecutor testified that he preferred jurors without children who were approximately the same age as the defendant.[7]  (N.T. 11/8/06 at 102.)  The prosecutor accepted all three of the

---

[7]At the time of the trial, Lark was 33 years old.  (N.T.  11/8/06 at 91.)

Caucasian veniremen who possessed the negative factor of having children the same age as defendant. (App. 1 (Giorgio, Petruzelli, Hawthorne).) He rejected eight of the 10 African-American veniremen with this negative factor.  (Id. (Alston, Robinson seated; Sampson, Green, Geter, F. Williams, Traynham, Lewis, Jefferson, Erby struck).) He accepted seven of the nine Caucasians who possessed the positive factor of having no children defendant's age.  (Id. (Longo, Merrill, Arentzen, Hamski, Caione, Kostryckyj, Mancini seated; Landis, Rabb struck).)  He accepted only two of the seven African-Americans who possessed this positive factor.  (Id. (Sheen, Hill seated; Cooper, Wilson, Patton, Sisco, S. Williams struck).)   We conclude there are racial variances in the prosecutor's application of his stated preference for jurors without children approximately the same age as the defendant.

### K.     Other factors

All veniremen who expressed a legitimate hardship, knew a witness, or had objections to the death penalty were excused for cause.  Accordingly, these cannot serve as legitimate non-race factors supporting any Commonwealth peremptory challenge.

### B.     Side-By-Side Comparison of Jurors

As we have discussed above, comparisons between a stricken African-American venireman and a similarly situated seated Caucasian juror is highly relevant at step three.  See Williams, 637 F.3d at 216; Miller-El II, 545 U.S. at 241-52.  Petitioner has asked that we consider comparison evidence with respect to thirteen of the African-American veniremen stricken by the prosecutor.

### 1.     Shirley Sampson

In Lark I, we found as fact that, after reading the voir dire transcript, the prosecutor had no independent or refreshed recollection of why he struck Sampson.  Lark I, 495 F. Supp. 2d at 495-96.

-18-

We found as fact that he was unable to offer any race-neutral justification for this peremptory strike. Id. at 499. Now that we are considering all of the evidence at step three, the Commonwealth has suggested that Sampson may have been stricken because she lived near the crime scene, her daughter was in the mental health profession, and defense counsel interacted with her for a prolonged period. (Resp. Mem. at 9-10.) Significantly, none of these factors were identified by the prosecutor at the evidentiary hearing as reasons why he may have stricken Sampson and they are entirely speculative. Also, while Ms. Sampson once lived in North Philadelphia, she testified she currently lived in Logan, her daughter's profession, mental health, was not one of the significant vocations identified by the prosecutor, and her interaction with defense counsel was not significantly different from defense counsel's questioning of other veniremen. Accordingly, we do not credit these explanations. We again find that the Commonwealth has failed to show any step two race-neutral reason for this strike.

Ms. Sampson possessed many of the positive attributes the prosecutor identified. The voir dire record discloses that she possessed the following racial, demographic, social, educational, and economic characteristics: African-American, female, married, older, lived in Logan, federal employee (Navy Quartermaster), home owner, some high school education (non-Catholic), four children two of whom were adults. (N.T. 6/6/85 at 33-38.) We find that Eleanor Giorgio is a comparator seated juror. Ms. Giorgio was Caucasian, female, married, older, lived in West Philadelphia, employed (University of Pennsylvania), home owner, high school education (non-Catholic), three adult children, one of whom was male. (N.T. 6/5/85 at 99-105.) Another seated juror comparator is Margaret Petruzzelli. She was Caucasian, female, married, older, lived in Mayfair, unemployed homemaker, home owner, high school education (Catholic), three adult

children, two of whom were male.  (N.T.  6/7/85 at 25-34.)  In addition, Sampson, Giorgio, and Petruzzelli were all interviewed early in the voir dire, at a time when the prosecutor had similar numbers of peremptory strikes still available to him, eliminating this as a distinguishing factor.

The two comparator seated jurors are very similar to Ms. Sampson with respect to many pertinent criteria.  Moreover, there were no Caucasian veniremen with equally close comparator criteria who were struck by the prosecutor.  Because the Commonwealth has not articulated any plausible race-neutral reason to support the prosecutor's peremptory strike of Ms. Sampson, and she was treated differently than comparator Caucasian veniremen who were seated, we conclude based upon our review of the record of the voir dire and the comparison of Ms. Sampson with members of the venire who possessed similar characteristics, that it is more likely than not that the prosecutor exercised his peremptory strike based upon her race.

2.    Alwina Green

Ms. Green possessed many of the positive, stable, attributes the prosecutor identified as preferable.  She was older, married, employed by the federal government, a high school graduate taking college courses, and owned her home in West Philadelphia.  (N.T. 6/6/85 at 100-108.)  The prosecutor stated at the evidentiary hearing that, while "she seem[ed] like a perfectly acceptable juror," he may have used his peremptory strike because Ms. Green was the mother of two teen-aged children and was attending night school.  He perceived that these factors may have indicated to him at the time that jury service would be too heavy a burden on her.  (N.T.  11/8/06 at 77-80.)  In its Response, the Commonwealth postulates additional reasons why Ms. Green may have been struck: she "had worked with disabled veterans (akin to 'social workers' about which the prosecutor was cautious . . .)" and that the prosecutor and defense counsel briefly argued in her presence.  (Resp.

Mem. at 10.)  Again, the prosecutor did not testify that these were factors he would typically consider in striking Ms. Green and they represent nothing more than speculation.  The Commonwealth's claim that she "worked with disabled veterans (akin to 'social workers' . . .)" is also a misreading of the record.  Ms. Green testified that her work involved approving life insurance applications for disabled veterans.  (N.T.  6/6/85 at 108.)  There is no evidence that she was engaged in work similar to "social work."

Notably, while the prosecutor testified twenty-one years after the fact that he might have stricken Ms. Green because jury service would present a heavy burden to her, Ms. Green herself claimed the opposite during voir dire.  She told counsel that her class work would not interfere with jury service,[8] and that jury service would merely replace her day time work commitment.  (Id. at 104.)   Accordingly, we do not credit this reasoning as a race-neutral justification for the Commonwealth's strike of Ms. Green.

We find that the same two Caucasian comparators discussed with regard to Shirley Sampson also can be compared to Ms. Green because they possessed many of the same pertinent criteria.  As we stated, Ms. Giorgio was a Caucasian female, who was married, was older, lived in the same neighborhood as Ms. Green (West Philadelphia), was employed, owned her home, and had a non-Catholic high school education; one difference, however, was the age of her children – Giorgio's three children were all adults.  (N.T.  6/5/85 at 99-105.)  Margaret Petruzzelli was a Caucasian female, who was married, was older, lived in Mayfair, was an unemployed homemaker, owned her home, and had a high school education (Catholic), with the same distinguishing factor that her children

---

[8] We note also that Lark's trial occurred during the month of June and there was no testimony that Green was currently attending classes.  (See N.T. 6/6/03 at 107 (testifying that her class schedule "**last** semester . . . was 3 nights a week") (emphasis added).)

were all adults.  (N.T.  6/7/85 at 25-34.)  Like Sampson, Giorgio, and Petruzelli, Ms. Green was also interviewed early in the voir dire, at a time when the prosecutor had similar numbers of peremptory strikes still available to him, eliminating this as a distinguishing factor.  We find that the only significant difference between these comparator jurors is the age of their children.  We do not credit this factor as a race-neutral justification for the Commonwealth's strike of Ms. Green.  First, contrary to the prosecutor's speculation that she might be overburdened by the fact that she was the mother of two children, Ms. Green testified that one of the two children did not live in the family home. (N.T. 6/6/03 at 103, 107.)  Additionally, the prosecutor did not specifically rely upon her child care commitment alone as a race-neutral reason for the strike.  Rather it was the perceived combined burden of her child care commitment with the incorrect assumption that she would be attending night school classes during the trial, that he indicated may have led him to believe that jury service would be too heavy a burden on her.  Because the Commonwealth has not articulated any plausible race-neutral reason to support the prosecutor's peremptory strike of Ms. Green, and she was treated differently than comparator Caucasian veniremen who were seated, we conclude based upon our review of the record of the voir dire and the comparison of Ms. Green with members of the venire who possessed similar characteristics, that it is more likely than not that the prosecutor exercised his peremptory strike based upon her race.

        3.    <u>Debra Cooper</u>

Debra Cooper was a 20 year old African-American woman living with her mother and two sisters in East Mount Airy, who was presently unemployed but had previously worked as a stock clerk and had attended community college studying finance.  (N.T.  6/6/85 at 122-28.)  The prosecutor testified that he might have struck Ms. Cooper because she was young, defense counsel

was an attractive man to whom she may have been attracted, and the voir dire transcript showed that defense counsel spent "about five pages interacting with her." (N.T. 11/8/06 at 82, 11/9/06 at 29.) While defense counsel spent similar amounts of time interacting with other female jurors whom the prosecutor did not strike, (e.g., Juror Filomenia Ciaone (N.T. 6/10/85 at 26-28); Juror Eleanor Giorgio (N.T. 6/5/85 at 102-05); Juror Margaret Petruzelli (N.T. 6/7/85 at 27-34)), we find the prosecutor did not act inconsistently with his stated preferences when he accepted Filomenia Caione but struck Ms. Cooper. Petitioner contends that Caione was similarly situated to Cooper. However, Caione was employed and enrolled in college (N.T. 6/10/85 at 25) while Cooper was presently unemployed and not currently enrolled. While they shared some characteristics – both were female, single, younger, did not live in the same area where the crime occurred, and lived with a parent – Ms. Caione attended Catholic schools (id.), a positive factor that Ms. Cooper did not share. Consequently, we cannot conclude that the prosecutor's acceptance of Ms. Caione as a juror undermines his race-neutral reasons for striking Ms. Cooper.

In addition, the prosecutor's assertion that defense counsel developed a rapport with Ms. Cooper is substantiated by the record. While he asked her questions similar to other venireman, including more in-depth questions about her background, he also joked with her about using recreational drugs and her "perfect ears." (N.T. 6/6/85 at 126-28.) The quality of this interaction differentiates her from any comparator seated juror. Accordingly, based on our review of the voir dire, the prosecutor's possible reasons for striking Ms. Cooper, and our comparison of Cooper and Caione, we cannot conclude that it is more likely than not that the peremptory strike of Ms. Cooper was based upon her race.

4.   Willie Geter

Willie Geter was an African-American woman who lived in the Tioga section of North Philadelphia, was unemployed, married, had a high school education (non-Catholic), two sons one of whom was an adult, and owned her home. (N.T. 6/7/85 at 40-45.) The prosecutor testified that he may have struck Ms. Geter because she lived in North Philadelphia, near the neighborhood where the crime took place. (N.T. 11/8/06 at 83.) The Commonwealth further notes that she was also unemployed and had a son the approximate age of Petitioner, although the prosecutor did not identify those factors as possible bases for his strike. These bases would be consistent with the prosecutor's stated preferences. We have not identified any Caucasian seated juror who shared these criteria. Based upon our review of the voir dire and the prosecutor's possible race-neutral reasons, we cannot conclude that it is more likely than not that the peremptory strike of Ms. Geter was based upon her race.

        5.    Florence Williams

In Lark I, we found as fact that the prosecutor had no independent or refreshed recollection of why he struck Florence Williams and could identify no factors present with regard to Ms. Williams that he typically would have taken into account in exercising a peremptory strike. Lark I at 497. The Commonwealth presently speculates that the prosecutor may have struck her because she had two children, ages 17 and 27, and the prosecutor had stated that he disfavored jurors who could over-identify with the Petitioner. (Resp. at 10.)

When we examine the voir dire transcript, we find that Williams had attributes the prosecutor considered positive. Williams was: African-American, female, married, older, lived in Mt. Airy, homemaker, high school education (non-Catholic), two adult children. (N.T. 6/7/85 at 96-100.) We find that Margaret Petruzelli is a comparator seated juror. Petruzelli was: Caucasian, female,

-24-

married, older, lived in Mayfair, homemaker, home owner, high school education (Catholic), adult children.  (N.T.  6/7/85 at 25-34.)  We have identified no Caucasian veniremen with equally close comparator criteria who were peremptorily struck by the prosecutor.  We conclude, based upon our review of the record of the voir dire, the fact that the prosecutor could not state a plausible race-neutral reason for his peremptory strike of Ms. Williams, and the comparison of Ms. Williams with a member of the venire who possessed similar characteristics, that it is more likely than not that the prosecutor exercised his peremptory strike based upon her race.

6.   Winnie Traynham

Winnie Traynham was an older African-American woman who was retired from her job at Temple Hospital.  (N.T. 6/7/85 at 102-03.)  She was a widow with training in nursing who lived in North Philadelphia with her two adult male sons.  (Id. at 104.)  The prosecutor testified that he may have struck Ms. Traynham because she was from roughly the same neighborhood where the incident occurred, and that she had two bachelor sons living at home who were approximately the same age as Petitioner.  (N.T.  11/8/06 at 89-90.)  On cross-examination, the prosecutor conceded that Ms. Traynham's two sons may have been far older than Petitioner, given references in the voir dire that Traynham was elderly at the time of Petitioner's trial.  (N.T. 11/8/06 at 44-45.)  Nonetheless, the possibility that he could have stricken her because she lived in the same neighborhood as the murder scene was consistent with the prosecutor's stated criteria and there were no comparator seated jurors with this criterion.  Accordingly, we cannot conclude that it is more likely than not that his peremptory strike of Ms. Traynham was based upon her race.

7.   William Wilson

William Wilson was an African-American man who had previously served as a juror, had

a friend who was a police officer, had been convicted of carrying a firearm without a permit, lived in North Philadelphia, was employed, and had a high school education.  (N.T. 6/7/85 at 146-152.) The prosecutor asked the trial judge to strike Mr. Wilson for cause based on his prior conviction but the judge denied the request.  (Id. at 152.)  The prosecutor testified that he may have struck William Wilson because he had been convicted of a gun crime.  (N.T. 11/8/06 at 92.)  No seated jurors shared this distinction.  Accordingly, based on our review of the voir dire and the prosecutor's possible race-neutral reason for striking Mr. Wilson, we cannot conclude that it is more likely than not that this peremptory strike was based upon race.

8.    Lisa Patton

Lisa Patton was a young African-American woman who was the niece of both a retired Philadelphia Police captain and an active Philadelphia Police lieutenant.  (N.T. 6/7/85 at 159-160.) She had attended high school at the Sicilian Academy, was employed as a part-time sales person during the summer while living with her parents in West Oak Lane, and was a full time student at Emory University.  (Id. at 162-63.)  The prosecutor testified that he may have struck her because she was a young women who might be attracted to defense counsel.  (N.T. 11/8/06 at 95-96.)  He admitted, however, that nothing in the record supported this concern.  (N.T. 11/9/06 at 31.)

Petitioner contends that the prosecutor's race-neutral reason for his strike of Ms. Patton is pretextual because there was a young female Caucasian veniremen the prosecutor did not strike. Filomenia Caione was a young Caucasian woman who lived with her parents while attending college and working part-time during the summer.  (N.T. 6/10/85 at 25-26.)  The prosecutor could not explain why he was unconcerned that Ms. Caione might also establish a rapport with defense counsel.  (N.T. 11/9/06 at 31-33.)  The prosecutor testified that Ms. Caione may have established a

rapport, but he was unconcerned about it because of Ms. Caione's other positive attributes:  she was employed, she attended a Catholic university (Villanova), and "looked like a person who could follow instructions and had a conscience."  (Id. at 33.)

We find that Ms. Caione is a close comparator venireman.  Ms. Patton was interviewed on the afternoon of June 7, 1985; Ms. Caione was interviewed on the morning of June 10, 1985, the next trial day.  The two women had many common attributes: age, part-time employment status, student status, and were living with a parent.  Ms. Caione had the positive attribute of a Catholic school education, but Ms. Patton had also attended a private school and had the positive attribute of police familial connections.  The amount of time defense counsel spent questioning the two was also similar, approximately one and one-half pages of transcript.  (Compare N.T. 6/7/85 at 163-64; N.T. 6/10/85 at 26-28.)  We conclude, based upon our review of the record of the voir dire and the comparison of Ms. Patton with Ms. Caione that it is more likely than not that the prosecutor's possible reason for striking Ms. Patton is not credible and that he exercised his peremptory strike of Ms. Patton based upon her race.

9.    Edison Sisco

In Lark I we found as fact that the prosecutor "could identify no specific factor present with regard to Cisco [sic] that he typically would have taken into account in exercising a peremptory strike."  Lark I at 497-98.  Nonetheless, the Commonwealth now postulates that, because neither the prosecutor nor defense counsel asked Mr. Sisco any questions, there may have been something about his appearance or demeanor that is undisclosed by the voir dire transcript that made an impression on the lawyers.  (Resp. Mem. at 12.)  While it is true that no other venireman, stricken or seated, was given as short a shrift as Mr. Sisco, this explanation is entirely speculative; the prosecutor did not

-27-

suggest at the evidentiary hearing that it was a factor in his decision.

Based upon the prosecutor's stated criteria, there is a comparator venireman who was seated. Sisco was an African-American, married, older male, who lived in West Philadelphia and was employed at Metropolitan Hospital in communications and had a non-Catholic high school education. (N.T. 6/7/85 at 171-72.) Sisco was similarly situated to Frank Hawthorne, who was a Caucasian, married, older male, who owned his own home in Kensington, had four adult children, was employed at Rohm & Haas as an operator and had a non-Catholic high school education. (N.T. 6/7/85 at 72-79.) Mr. Hawthorne was accepted for the jury even though he had the negative factors of having four adult sons, one of whom had been arrested as a juvenile. (Id. at 75-76.) Also, Mr. Hawthorne was accepted as the ninth seated juror, after five Commonwealth peremptories had been used and at a time when the prosecutor had peremptories still available to him to act upon these negative factors. Between the prosecutor's acceptance of Mr. Hawthorne and his strike of Mr. Sisco, no additional jurors had been seated and the prosecutor had exercised four additional peremptories, all against African-Americans, making the strike he used against Mr. Sisco more precious. Based on our review of the voir dire, and the prosecutor's lack of any race-neutral reasons for his strike of Mr. Sisco, his acceptance of the Caucasian comparator, and the comparative value of the remaining peremptory strike exercised against this African-American veniremen, we conclude that it is more likely than not that the strike was based upon Mr. Sisco's race.

          10.    <u>Sandra Williams</u>

Sandra Williams was an African-American woman who lived in the Nicetown section of Philadelphia, was employed by the Internal Revenue Service, was married, had a degree from Harcum Junior College and had attended public high school. (N.T. 6/7/85 at 173-75.) She had two

-28-

minor children and had previously lived in North Philadelphia.  (Id. at 175.)  The prosecutor testified

that he may have struck Ms. Williams because she lived in the area where the murder took place.

(N.T. 11/8/06 at 98.)  Petitioner has not argued that Ms. Williams was treated differently than any

similarly situated seated juror.  Accordingly, based on our review of the voir dire record and the

prosecutor's possible race-neutral reason for his peremptory strike of Ms. Williams, we cannot

conclude that it is more likely than not that the peremptory strike of Ms. Williams was based upon

her race.

> 11.   Helen Lewis

Helen Lewis was an African-American woman whose daughter had been the victim of a

gunpoint robbery two years before Lark's trial.  (N.T. 6/5/85 at 4.)  She stated that this crime would

not affect her ability to be fair.  (Id. at 5.)  In addition, her son had been arrested as a juvenile.  (Id.

at 6.)  Ms. Lewis lived in the Fairmount section of Philadelphia, was unemployed, had a high school

education, five children and was a widow.  (Id. at 6-7.)  The prosecutor noted the following factors

in the transcript of Lewis' voir dire that were consistent with his criteria for jury selection:  she had

a daughter that was robbed at gunpoint – which ordinarily would have been a positive factor for the

prosecutor – but she seemed overly concerned about being fair; she also had the negative factor of

a son who was arrested as a juvenile.  (N.T. 11/8/06 at 100.)  He testified that he may have accepted

her as a juror if he had fewer peremptories, but at that point in the voir dire he had sufficient strikes

remaining.  (Id. at 100-01.)  Petitioner argues that the prosecutor's stated concern about Ms. Lewis

being overly concerned with fairness is belied by the record.  When asked if her daughter being

robbed would affect her, she confirmed that she "would be fair to someone.  I would hate to think

that I wasn't fair to a person for what someone else did.  I don't think I could do that."  (N.T.

6/10/85 at 5.)  She also stated that she could put her daughter's experience out of her mind because it was a different case.  (Id.)

Petitioner argues that Ms. Lewis was treated differently with regard to this issue than a similarly situated Caucasian who was seated as a juror.  Richard Longo, who testified that the beating of one cousin and the shooting of another cousin made him "skeptical" about police and responded "yes, basically" when asked by the trial court if the experience left a "feeling of disappointment or resentment at the way the police handled the case."  (N.T.  6/5/85 at 63-64.) Because of significant differences between them, we do not consider Mr. Longo a close comparator to Ms. Lewis.  As stated, Ms. Lewis was a widowed, older, female, African-American, who lived in Fairmount, was unemployed (disabled former domestic), and was high-school educated (non-Catholic) with five children, one of whom was arrested as a juvenile.  (N.T.  6/10/85 at 2-8.)  She was also considered very late in the voir dire process when only three seats were still unfilled.  Mr. Longo was a married, male, younger Caucasian, who lived in South Philadelphia, was employed as a project manager, and was Catholic school educated with two young children.  (N.T.  6/5/85 at 57-70.)  Mr. Longo was the first venireman seated on the jury.  (Id. at 70.)

Petitioner further argues that Ms. Lewis was treated differently from a similarly situated Caucasian seated juror, Frank Hawthorne, whose son was also arrested as a juvenile.  Mr. Hawthorne was a Caucasian, married, older male, who lived in Kensington and was employed at Rohm & Haas as an operator, had a non-Catholic high school education, a niece who was a Philadelphia police officer involved in the MOVE confrontation, and a son that was arrested as a juvenile.  (N.T.  6/7/85 at 72-79.)  In addition, Mr. Hawthorne testified in a civil matter involving a problem with Caucasian youths in his neighborhood using drugs and harassing neighbors, and chartered a civic group to deal

with this issue.  (Id. at 74-75.)  We find that there are significant distinctions between Ms. Lewis and

Mr. Hawthorne.  While Ms. Lewis was widowed and unemployed, Mr. Hawthorne was married,

currently employed, related to a police officer, and involved with an anti-drug civic group.  While

Ms. Lewis and Mr. Hawthorne shared the significant factor of having a son arrested as a juvenile,

we find the totality of the information adduced about the two veniremen at the voir dire removes Mr.

Hawthorne as a comparator.  Accordingly, based on our review of the voir dire and the prosecutor's

possible reasons for his peremptory strike, we cannot conclude that it is more likely than not that the

prosecutor's peremptory strike of Ms. Lewis was based upon her race.

### 12.    Edith Jefferson

Edith Jefferson had the following characteristics:  African-American, female, married, older,

lived in South Philadelphia, unemployed, rented her home, high school education (non-Catholic),

two adult children (age unspecified but with their own children).  (N.T.  6/10/85 at 10-14.)  The

prosecutor stated that he may have struck Ms. Jefferson because she had children approximately the

same age as Petitioner and that she was considered late in the voir dire process – eleven jurors had

been seated – when he still had strikes left and could be more choosey.  (N.T.  11/8/06 at 102.)

Petitioner contends that Ms. Jefferson was treated differently from two seated Caucasian

jurors, Eleanor Giorgio and Margaret Petruzelli.  Ms. Giorgio, as we stated earlier, was Caucasian,

female, married, older, lived in West Philadelphia, was employed at the University of Pennsylvania,

owned her home, had a high school education (non-Catholic), and had three adult children, one of

whom was male.  (N.T.  6/5/85 at 99-105.)  Ms. Petruzelli, as we described earlier, was Caucasian,

female, married, older, lived in Mayfair, was an unemployed homemaker, owned her home, had a

high school education (non-Catholic), and had three adult children, one of whom was male.  (N.T.

6/7/85 at 25-34.)  However, one factor that differentiates Ms. Jefferson from Ms. Giorgio and Ms. Petruzelli is that, while the comparators were interviewed early in the voir dire, Ms. Jefferson was interviewed much later when the prosecutor, as he testified, could be more choosey.  We find this is a legitimate distinction between Ms. Jefferson and the comparators.  Accordingly, based on our review of the voir dire, the prosecutor's possible race-neutral reason for his peremptory strike of Ms. Jefferson, and the comparisons with the two seated jurors, we cannot conclude that it is more likely than not that the peremptory strike of Ms. Jefferson was based upon her race.

13. Rosa Erbe

Rosa Erbe was an African-American, widowed, older, woman who lived in Southwest Philadelphia, worked at the Hershey Hotel in food service, attended public high school and had two adult sons who both had been convicted of crimes.  (N.T. 6/10/85 at 51-54.)  The prosecutor testified that he may have struck Ms. Erbe because her sons had been convicted of crimes.  (N.T. 11/8/06 at 103-104.)  Petitioner offers no specific comparator venireman who was seated on the jury. Accordingly, based on our review of the voir dire, and the prosecutor's possible race-neutral reason for his peremptory strike of Ms. Erbe, we cannot conclude that it is more likely than not that the peremptory strike of Ms. Erbe was based upon her race.

C. The prosecutor's pre-Batson defense to claims of discrimination

"The Third Circuit has recognized that, at the third step, a prosecutor's present race-neutral explanations for his or her strikes must be evaluated in light of any pre-Batson defense to the claim that those strikes were racially discriminatory in violation of the Equal Protection Clause." Hardcastle v. Horn, 521 F. Supp. 2d 388, 403 (E.D.Pa. 2007) (aff'd 332 F. App'x 764 (3d Cir. 2009)) (citing Riley, 277 F.3d at 284-85 (noting that the prosecutor's explanations for striking an

African-American juror "must be evaluated . . . in light of the nature of the State's pre-Batson

defense on direct appeal" and stating that prevailing law that permitted strikes on the basis of race

was "significant" to the step 3 analysis)).

The prevailing law in the Commonwealth of Pennsylvania at the time of Petitioner's trial on

the permissibility of race-based peremptory strikes was Commonwealth v. Henderson, 438 A.2d 951

(Pa. 1981).  As we stated in Hardcastle,

> Henderson adhered to the holding in Swain [v. Alabama, 380 U.S. 202 (1965)] that
> intentional discrimination in jury selection in violation of the Equal Protection Clause
> could only be proven by a pattern of purposeful discrimination over many cases,
> "'with the result that no Negroes ever serve on petit juries . . . .'"  Henderson, 438
> A.2d at 956 (quoting Swain, 380 U.S. at 223).  Indeed, the Pennsylvania Supreme
> Court stated, in Henderson, that the purposeful elimination of African-American
> venirepersons from a particular jury on the basis of race would not necessarily violate
> the Constitution.

Hardcastle, 521 F.Supp.2d at 403.

This discussion of Pennsylvania's pre-Batson law provides the context to statements made

by the prosecutor in response to a defense objection during voir dire.  After the prosecutor exercised

six consecutive strikes of African-American veniremen, the prosecutor and defense counsel became

involved in an exchange of comments concerning the prosecutor's actions.  In our Lark I opinion,

we found as fact that defense counsel

> raised an objection, and sought to preserve a record, regarding the Commonwealth's
> pattern of using peremptory strikes to remove African-American veniremen from the
> jury.  Notes of Testimony at 176-77, Commonwealth v. Lark, Jan. Term 1980, No.
> 2012-2022 (Ct. C.P. Phila. June 7, 1985). [Defense counsel] stated to the trial judge,
> "as of this afternoon, your Honor, he is striking all blacks."  [The prosecutor]
> responded, "Oh, how awful."  Id. at 177.
>     [The prosecutor] testified that he remembered exactly what he meant when
> he said "Oh, how awful."  He was being sarcastic, because he recognized [defense
> counsel's] objection as an attempt to raise a racial issue.  When he made the
> statement, nine jurors had been seated of whom three were African-American. (N.T.

> 11/8/06 at 106.)  [The prosecutor] was irritated with what he saw to be a ploy to put a racial issue into the case.  He testified that he used sarcasm, which he conceded was not his most attractive quality, at other points in the trial when he became frustrated with [defense counsel's] trial tactics.  (Id. at 107-108.)

Lark I, 495 F.Supp.2d at 498.  Irrespective of the prosecutor's claim that his comment was meant as sarcasm, Petitioner argues that the prosecutor's additional comments relating to his legal justification for making his strikes are highly significant.  Petitioner contends that, in the heat of the moment, the prosecutor did not challenge the accuracy of defense counsel's factual charge that "he was striking all blacks" who had been part of the venire panel called that day, but instead summarily denied any *systematic* exclusion of black jurors, noting that three of the nine jurors who had already been seated were black:

> I know that on this jury in my opinion, we have selected 9 jurors, 30 percent of which are Black.  Now, that's my opinion.  That's my perception.  It may be more.  But it's certainly not less.  And all of the lawyer [sic] –
>> [Defense counsel]: I'm not challenging the law, John.
>> [The prosecutor]: Systematic exclusion of anybody on the basis of race.  I'm not – and there's – obviously not systemic exclusion when you've got 3 members out of 9 who are the same race as the defendant and his attorney.

(N.T.  6/7/85 at 181.)   According to Petitioner, the prosecutor's denial of *systematic* exclusion of all black jurors is telling because, at the time of the trial, Pennsylvania law allowed counsel to strike jurors on the basis of race, so long as it was *not* systematic.  Petitioner asserts that the reference to systematic exclusion is evidence that the prosecutor knew the prevailing law, and was knowingly striking individual black jurors on account of their race because he knew that prevailing law permitted him to do so.[9]

---

[9]The prosecutor testified at the evidentiary hearing that, at the time of the trial he "was not sure" if it was permissible to strike jurors on the basis of their race.  He was aware of the rule of Swain condemning the systematic exclusion of racial groups from jury venires and was also familiar with state court precedents.  (N.T. 11/8/06 at 65; see Lark I, 495 F. Supp. 2d at 495.  He had testified

We find that the prosecutor's resort to a denial of systematic racial exclusion is additional circumstantial evidence supporting Petitioner's claim that it is more likely than not that he struck one or more African-American veniremen because of their race.  The prosecutor's denial of systematic racial exclusion indicates that he understood the prevailing legal parameters of race-conscious jury selection under state law and argued them to the trial judge in response to the defense objection.  He did not deny the allegation that he was striking African-Americans on account of their race, he only denied that he was doing so systematically.  This evidence supports the conclusion that the prosecutor's race-neutral explanations for individual strikes are neither plausible nor reliable.  See Riley, 277 F.3d at 285 (noting that the state's contemporaneous reliance on Swain to defend a claim on direct appeal that it had exercised its strikes in a racially discriminatory manner, together with the state's failure to deny on direct appeal that it exercised its strikes in a racially discriminatory manner "suggests that race was at least a partial basis for its use of peremptory challenges," which suggestion supports the conclusion "that the State's proffered race-neutral explanations are pretextual").

IV.   CONCLUSION

Having carefully considered all of the evidence on the record before us, we find that Petitioner has satisfied his burden of establishing by a preponderance of the evidence that the Commonwealth's strikes of five African-American members of the venire, Shirley Sampson, Alwina

---

at the evidentiary hearing that

> I knew at that time that there were certain cases that addressed the selection of the jury panel as a whole, that is all the jurors who would be brought in for that day.  And I knew there were all – there was also – I knew there was – that – that the focus was on systematic exclusion of – of blacks, just because they're black I guess, and that I knew that wasn't right.

(N.T.  11/8/06 at 65.)

Green, Florence Williams, Lisa Patton, and Edison Sisco were motivated by race in violation of the Equal Protection Clause of the Fourteenth Amendment.  We base this finding upon the totality of the evidence presented, including the statistical evidence of disparity in the prosecutor's strike rates and acceptance rates of African-American and Caucasian veniremen, the racial disparities in the application of his jury selection criteria, the comparison evidence, and the prosecutor's focus and contemporaneous defense to the accusation of racial discrimination.  Consequently, we again find that the proper relief in this case is to conditionally grant Petitioner's writ, vacate his conviction, and allow the Commonwealth of Pennsylvania to retry Petitioner.

An appropriate order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.